1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

8
9

GREATER SAN DIEGO COUNTY
ASSOCIATION OF REALTORS, INC.,

Plaintiff,

v.

SANDICOR INC.; NORTH SAN DIEGO
COUNTY ASSOCIATION OF
REALTORS; and PACIFIC
SOUTHWEST ASSOCIATION OF
REALTORS,

Defendants.

Case No.:  16CV96-MMA (KSC)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS; AND**

**DENYING DEFENDANT NORTH
SAN DIEGO COUNTY
ASSOCIATION OF REALTORS'
AND DEFENDANT PACIFIC
SOUTHWEST ASSOCIATION OF
REALTORS' MOTION FOR
ATTORNEYS' FEES**

[Doc. Nos. 24, 25, 26]

18
19

        Defendant Sandicor, Inc. ("Sandicor") moves to dismiss certain causes of action in Plaintiff's First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).  [Doc. No. 26.]  Defendants North San Diego County Association of Realtors and Pacific Southwest Association of Realtors (collectively, the "Association Defendants") move to dismiss certain causes of action in the FAC under Rule 12(b)(6) and move for attorneys' fees pursuant to California Civil Code section 1717(a).  [Doc. Nos. 24, 25.]  The Defendants filed notices of joinder, joining in the others' motion to dismiss.  [Doc. Nos. 27, 28.]  The Court heard oral argument on Monday, May 16, 2016 and subsequently took the matters under submission.

//

For the reasons set forth below, the Court **DENIES** the Association Defendants' motion for attorneys' fees, Doc. No. 25, and **GRANTS IN PART** and **DENIES IN PART** Defendants' motions to dismiss, Doc. Nos. 24, 26.

## FACTUAL BACKGROUND

Plaintiff San Diego Association of Realtors ("Plaintiff" or "SDAR") filed this action on January 14, 2016, alleging several causes of action against Defendants Sandicor and the Association Defendants.[1]  Plaintiff initially listed its name as "Greater San Diego County Association of Realtors" in the Complaint.  Defendants filed motions to dismiss the Complaint on March 4, 2016.  Plaintiff then filed a First Amended Complaint ("FAC") on March 25, 2016, listing Plaintiff's name as "San Diego Association of Realtors."  [Doc. No. 18.]  Upon Plaintiff's timely filing of the FAC, the Court issued an Order stating that the FAC superseded the original Complaint, and that Defendants' pending motions to dismiss the original Complaint were accordingly moot.  *See* Doc. No. 20; Fed. R. Civ. P. 15(a)(1)(B).

Plaintiff SDAR is an association of real estate brokers.  Plaintiff was one of the founding shareholders of Defendant Sandicor.  Defendant North San Diego County Association of Realtors is also an association of real estate brokers.  It is a minority shareholder of Defendant Sandicor, with approximately 22% of Sandicor's outstanding shares.  Defendant Pacific Southwest Association of Realtors is also an association of real estate brokers and a minority shareholder of Defendant Sandicor, with approximately 10% of Sandicor's outstanding shares.  Defendant Sandicor "was formed for the sole purpose of consolidating several different multiple listing services into one consolidated database."  [FAC ¶ 7.]  It is "a local cooperative owned by its shareholders: Plaintiff and the Association Defendants."  [FAC ¶ 39.]

Plaintiff has the highest membership of all associations in the market for real estate

---

[1] Because this matter is before the Court on a motion to dismiss, the Court must accept as true the allegations set forth in the complaint. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976).

brokers and salespeople in San Diego County.  There used to be eleven realtor associations in San Diego County, but today, there are only three—Plaintiff and the Association Defendants.  [FAC ¶ 78.]  Sandicor was formed by the eleven broker associations in existence in San Diego County in 1991, including Plaintiff.  The associations created Sandicor for one purpose—to "aggregate[e] the previous associations' separate [multiple listing services ("MLS")] to one centralized MLS with an online database accessible to all local brokers."  [Doc. No. 18, FAC ¶ 16.]  Sandicor compiles information regarding homes for sale in San Diego County, which it obtains from the member-brokers of the shareholder associations that must supply such information as participants of the MLS.  [FAC ¶ 39.]  Members of the component shareholder associations create their own MLS listings, which become part of the Sandicor MLS database that can be viewed by other real estate brokers who are either shareholders of Sandicor or subscribers to the MLS feed.  The database also includes "historical information regarding sold properties that is critical to analyzing property values and market comparables."  [FAC ¶ 17.]

"The MLS data is of fundamental value to Sandicor's shareholder associations." [FAC ¶ 18.]  "The products and services of associations and third-party vendors rely on the integration of MLS data feeds and other aspects of the MLS platform for nearly all of their utility."  [FAC ¶ 19.]  Sandicor "has market power because it comprises 100% of the market for consolidated MLS data for San Diego County."  [FAC ¶ 41.]  Plaintiff and the Association Defendants are direct, horizontal competitors.  Plaintiff and the Association Defendants compete in the "innovation and implementation of these products and services."  [*Id.*]  Sandicor's shareholder associations "are entitled to use the consolidated MLS data pursuant to its governing documents and the shareholder agreement."  [FAC ¶ 23.]

In 1999, five associations, including Plaintiff and the Association Defendants, entered into a shareholder agreement.  Today, only Plaintiff and the Association Defendants remain shareholders, but the terms of the shareholder agreement remain the

same.  Pursuant to the agreement, the Association Defendants control Sandicor's board of directors, despite that they are minority shareholders.  The board of directors is comprised of six directors, two appointed by each shareholder association.  For major corporate transactions, at least two shareholders must approve regardless of voting power accumulated through shares of stock.  Further, a shareholder owning more than two-thirds of the shares may veto proposals requiring shareholder approval.  Plaintiff holds more than two-thirds of Sandicor's stock (due to membership), but its directors only have four-elevenths of the voting power.  Pacific Southwest Association of Realtors' two directors have three votes total, North San Diego County Association of Realtors' two directors have four votes total, and Plaintiff's two directors have four votes total.  Thus, Plaintiff cannot make major corporate decisions without the Association Defendants' approval, despite that it owns more than two-thirds of Sandicor.  [FAC ¶ 47.]

In 1999, Sandicor entered into the "Service Center Agreement" with Plaintiff, agreeing to provide "MLS-related support services to certain professionals in the real estate industry."  [FAC ¶ 50.]  The contract was amended and restated in 2004.  Plaintiff agreed to pay Sandicor monthly fees and Sandicor agreed to allow Plaintiff access to its MLS data to "download, use and distribute . . . for membership consumption and statistical purposes."  [*Id.*]

In 2009, Plaintiff began developing an online product, "Just Knock," that would allow its members to provide clients "with access to a hyper-local community resource to assist in the home-buying process."  [FAC ¶ 22.]  Just Knock requires current and historical MLS data.  Plaintiff later developed another platform called Showing Suite, which required historical MLS data as well.

The Association Defendants became threatened by Plaintiff's use of the MLS data to create innovative products and services and as a result, "conspired to restrict and/or prevent Plaintiff from accessing Sandicor's MLS data."  [FAC ¶ 24.]  In 2013, after Plaintiff had tried unsuccessfully several times to access an unrestricted MLS datafeed from Sandicor for Just Knock, Plaintiff contracted with a third party with access to a

syndicated Sandicor feed, Point2.  "Using the syndicated data feed, Just Knock launched in early 2015 and was a demonstrable success."  [FAC ¶ 26.]  As a result, the Association Defendants "instructed Point2 (through Sandicor) to eliminate any data originating from members of the Association Defendants from the Just Knock feed."  [FAC ¶ 27.]  Sandicor's CEO wrote to Point2, stating "SDAR is not entitled to any data from us . . . unless our BoD authorizes it . . .The only path has been as a syndication site, which means that brokers have control (advertising) of whether their listings appear or don't appear on the site."  [FAC ¶ 27.]  Representatives of the Association Defendants also contacted Point2 and requested that it keep any listings from Just Knock.  The Association Defendants took steps to keep their members from having the option of opting in to the Just Knock syndication.[2]  The Association Defendants also denied Plaintiff access to the MLS data feed for Plaintiff's other product, Showing Suite, unless Plaintiff would make Showing Suite available for use by the Association Defendants.

At a board meeting, the chair of Sandicor's board of directors was asked why the board intervened with Plaintiff's relationship with Point2, particularly in light of the fact that Sandicor did not intervene when Point2 provided the same data to the San Diego Union Tribune, a third party.  The chair, Aaron Kerper, who is a representative of Pacific Southwest Association of Realtors, answered that the difference in treatment was due to the fact that the Union Tribune does not compete with Defendant Pacific Southwest Association of Realtors.

Further, Sandicor requires members who transfer associations to use two log-ins, in order to deter them from transferring associations, as "listings are log-in specific."  [FAC ¶ 34.]  This rule "directly contravenes the Service Center Agreement" and was meant to deter members from leaving the Association Defendants' associations, as the Association Defendants have a much higher turnover rate than Plaintiff.  "[M]embership losses for the

---

[2] In another section, the FAC alleges "Defendants also uniformly demanded the 'opt-out' of their respective members' data (their Realtor members' data) from the syndication feed, thereby significantly reducing the data feed Plaintiff received by 30 percent."  [FAC ¶ 53.]

Association Defendants are typically membership gains for Plaintiff." [*Id.*]

The Association Defendants also "used their control of Sandicor to create a website that directly competes with Plaintiff's web-portal, at great expense and over Plaintiff's objection, for the sole benefit of the Association Defendants." [FAC ¶ 53.] Plaintiff opposed the use of Sandicor's resources to that end as such conduct "was beyond the scope of Sandicor's duties." [FAC ¶ 54.] Plaintiff states that it should have been able to prevent the Association Defendants from developing Sandicor's web-portal because it is the supermajority shareholder and the development constituted a major corporate resolution requiring approval by two-thirds vote of the shareholders. However, the Association Defendants "acted in concert and through Sandicor to structure the proposal for the website development such that the individual payments fell below the threshold for shareholder approval." [FAC ¶ 55.] This "caused Sandicor to incur more than $75,000 (in funds that are derived, largely from Plaintiff's membership) for the sole benefit of the Association Defendants and to the detriment of Plaintiff." [*Id.*]

Moreover, the Association Defendants have used Sandicor and thereby its funds to provide educational programs, products, and services for their members that the individual associations typically provide themselves. Plaintiff objects that this amounts to the Association Defendants using Plaintiff's money to "cause Sandicor to go beyond its intended purpose" for the Association Defendants' benefit and to Plaintiff's detriment. [FAC ¶ 56.]

Lastly, in October 2014, "a motion to explore a merger was formally proposed—without notice to Plaintiff—and approved, notwithstanding the fact that the merger is a major corporate resolution that could not have been passed without Plaintiff's two-thirds shareholder vote." [FAC ¶ 63.] The Association Defendants and Ray Ewing "pushed through a 'task force' to investigate a *merger* between Sandicor and the California Regional Multiple Listing Service ("CRMLS") at considerable expense of Sandicor." [FAC ¶ 60.] Mr. Ewing marketed the benefits of a merger and defamed Plaintiff to its members and third parties, and encouraged Plaintiff's members to transfer to the

Association Defendants' associations.  Plaintiff objected.  A merger would diminish the value of Sandicor's database.  [FAC ¶ 69.]

As for Plaintiff's injury, the FAC states Defendants' actions "have stifled Plaintiff's efforts to provide the innovations it has invested time and money developing, including Just Knock and Showing Suite."  [FAC ¶ 35.]  Further, "Plaintiff has lost members and has not obtained new members it would have obtained but for [the Association Defendants' conduct]."  [*Id.*]  The Association Defendants' and Ray Ewings's conduct has harmed competition and precluded Plaintiff from effectively competing.  Plaintiff does not have a reasonable alternative source of the data, as the Defendants have interfered with Plaintiff's ability to obtain the same information from third parties.

The FAC alleges the following causes of action: violation of federal and state antitrust laws pursuant to the Sherman Act and California's Cartwright Act; direct claim for breach of fiduciary duty; derivative claim for breach of fiduciary duty; derivative claim for waste of corporate assets; violation of California Corporate Code sections 1601 and 1602; unfair competition or business practice pursuant to California Business and Professions Code sections 17200, *et seq.*; breach of written contract; breach of the implied covenant of good faith and fair dealing, intentional interference with contractual relations; and Plaintiff seeks a declaratory judgment that a portion of the shareholder agreement is unenforceable.  In Plaintiff's original Complaint, Plaintiff asserted its causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing against all Defendants, but in the FAC, Plaintiff only asserts those claims against Sandicor.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ."  Fed. R. Civ. P. 8(a)(2).  However, plaintiffs must also plead "enough facts to state a claim to relief that is

1  plausible on its face."  Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

2  570 (2007).  The plausibility standard thus demands more than "a formulaic recitation of

3  the elements of a cause of action," or "naked assertions devoid of further factual

4  enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).

5  Instead, the complaint "must contain allegations of underlying facts sufficient to give fair

6  notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652

7  F.3d 1202, 1216 (9th Cir. 2011).

8          In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth

9  of all factual allegations and must construe them in the light most favorable to the

10  nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

11  The court need not take legal conclusions as true merely because they are cast in the form

12  of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

13  Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to

14  defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

15          In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not

16  look beyond the complaint for additional facts. *United States v. Ritchie*, 342 F.3d 903,

17  908 (9th Cir. 2003).  "A court may, however, consider certain materials—documents

18  attached to the complaint, documents incorporated by reference in the complaint, or

19  matters of judicial notice—without converting the motion to dismiss into a motion for

20  summary judgment." *Id.*; *see also* Fed. R. Evid. 201; *see also Lee v. City of Los Angeles*,

21  250 F.3d 668, 688 (9th Cir. 2001) *overruled on other grounds by Galbraith v. Cnty. Of*

22  *Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002).  Where dismissal is appropriate, a

23  court should grant leave to amend unless the plaintiff could not possibly cure the defects

24  in the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

### DISCUSSION

25

26  **A.    Motion for Attorneys' Fees**

27          The Association Defendants argue they are entitled to $17,555.17 in attorneys' fees

28  for defending against the breach of contract and breach of the implied covenant of good

faith and fair dealing claims that Plaintiff included in its original Complaint against the Association Defendants.  The Association Defendants argue they are entitled to such fees because they were not parties to the underlying contract (the Service Center Agreement), and moved to dismiss those causes of action, resulting in the Plaintiff filing the FAC, which omits contractual claims against the Association Defendants.  The Association Defendants allege this makes them the "prevailing party" pursuant to California Civil Code section 1717(a).  According to Defendants, under section 1717(a), prevailing parties must be awarded attorneys' fees in actions on contracts that explicitly provide for fees and costs, regardless of whether they were parties to the contract.  Defendants admit that there is no prevailing party where an action has been voluntarily dismissed, but argue that this case has not been dismissed for two reasons.  First, Defendants argue that Plaintiff's abandonment of those claims was involuntary because it was in direct response to Defendants' motion to dismiss.  Second, Defendants argue that Plaintiff did not dismiss the "action" because it did not dismiss the entire case.

In its opposition, Plaintiff cites *Ford Motor Credit Co. v. Hunsberger* in support of the proposition that, under section 1717, "action" is interpreted not only to mean an entire case, but some causes of action or parties.  163 Cal. App. 4th 1526, 1532 (2008).  Also, Plaintiff asserts that even were the Court to find Defendants are entitled to fees, the Court cannot reasonably determine whether Defendants' requested amount of fees is reasonable because Defendants have not submitted sufficient support for the request, or excluded fees for time spent on claims that are realleged in the FAC.

At oral argument, Defendants argued that *Hunsberger* is inapposite because in that case, the plaintiff dismissed the only cause of action the plaintiff had brought against a defendant, thereby dismissing the entire action as to that defendant.

California Civil Code section 1717(a) states:

> In any action on a contract, where the contract specifically
> provides that attorney's fees and costs, which are incurred to
> enforce that contract, shall be awarded either to one of the

parties or to the prevailing party, then the party who is
determined to be the party prevailing on the contract, whether
he or she is the party specified in the contract or not, shall be
entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717; *Hyduke's Valley Motors v. Lobel Fin. Corp.*, 189 Cal. App. 4th
430, 434 (2010).  The California Supreme Court has stated that "[t]he primary purpose of
section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual
attorney fee provisions." *Santisas v. Goodin*, 17 Cal. 4th 599, 610–11 (1998).  The Court
elaborated that:

Courts have recognized that section 1717 has this effect in at
least two distinct situations.  The first situation in which section
1717 makes an otherwise unilateral right reciprocal, thereby
ensuring mutuality of remedy, is "when the contract provides
the right to one party but not to the other."  In this situation, the
effect of section 1717 is to allow recovery of attorney fees by
whichever contracting party prevails, "whether he or she is the
party specified [to receive fees] in the contract or not."  The
second situation in which section 1717 makes an otherwise
unilateral right reciprocal, thereby ensuring mutuality of
remedy, is when a person sued on a contract containing a
provision for attorney fees to the prevailing party defends the
litigation "by successfully arguing the inapplicability,
invalidity, unenforceability, or nonexistence of the same
contract."  Because these arguments are inconsistent with a
contractual claim for attorney fees under the same agreement, a
party prevailing on any of these bases usually cannot claim
attorney fees as a contractual right.  If section 1717 did not
apply in this situation, the right to attorney fees would be
effectively unilateral — regardless of the reciprocal wording of
the attorney fee provision allowing attorney fees to the
prevailing attorney — because only the party seeking to affirm
and enforce the agreement could invoke its attorney fee
provision. To ensure mutuality of remedy in this situation, it
has been consistently held that when a party litigant prevails in
an action on a contract by establishing that the contract is
invalid, inapplicable, unenforceable, or nonexistent, section

1
2

> 1717 permits that party's recovery of attorney fees whenever
> the opposing parties would have been entitled to attorney fees
> under the contract had they prevailed.

3
4

*Id.* (internal citations omitted).

5
6
7
8
9
10
11
12
13

Here, Plaintiff's causes of action for breach of contract and breach of the covenant of good faith and fair dealing clearly constituted actions "on a contract."  However, the first situation contemplated by the California Supreme Court, above, does not apply here because the contract contained a reciprocal attorneys' fees provision and the Association Defendants were not "contracting part[ies]."[3]  Similarly, the second situation described above does not exist here.  It cannot be said that Defendants prevailed "by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent."  Defendants have not "established" anything by filing a motion to dismiss.  Defendants merely raised arguments in their motion, upon which the Court did not rule.

14
15
16
17
18
19
20
21
22
23

This case is more analogous to the situation described in 1717(b)(2), which states that where a case is voluntarily dismissed by a plaintiff, due to settlement or otherwise, there is no prevailing party.  *See* § 1717(b)(2).  Defendants' argument that Plaintiff did not voluntarily dismiss its claims is unpersuasive.  The Court did not rule on Defendants' motion to dismiss.  Rather, Plaintiff voluntarily abandoned its contract claims by failing to reallege those claims in the FAC.  Defendants' contention that this case is not analogous to voluntary dismissal of an action because Plaintiff abandoned fewer than all causes of action is unconvincing.  Plaintiff correctly points out that a California Court of Appeal rejected that exact contention in *Hunsberger*.  *See* 163 Cal. App. 4th at 1532.  Defendant is correct that *Hunsberger* is slightly distinguishable from this case in that the

24
25
26
27
28

---

[3] Further, where fees have been awarded to those that are not parties to a contract, the movant generally has been a third-party beneficiary of the contract.  The Association Defendants do not claim to be third-party beneficiaries to the Service Center Agreement.  Even in such a case, "a nonsignatory seeking relief as a third-party beneficiary may recover fees under a fee provision only if it appears that the contracting parties intended to extend such a right to one in his position."  *Hydukes*, 189 Cal. App. 4th at 436 (internal quotations and alterations omitted); *see also Sessions Payroll Management, Inc. v. Noble Const. Co., Inc.*, 101 Cal. Rptr. 2d 127 (Ct. App. 2000).  There is no evidence of such intent here.

plaintiff dismissed its only cause of action against a particular defendant and here, the FAC asserts other causes of action against the Association Defendants aside from the contractual claims.  However, the *Hunsberger* court of appeal's reasoning applies equally here.  In *Hunsberger*, the court reasoned that limiting 1717(b)(2) to only scenarios where an entire action has been voluntarily dismissed would be inconsistent with the purpose of 1717, which is to encourage parties to voluntarily "dismiss pointless litigation in moot cases or where the defendant is insolvent rather than maintain it merely to avoid liability for another party's attorney fees."  163 Cal. App. 4th at 1531–32.  Further, the court of appeal rejected an argument framed exactly as the Association Defendants have framed their argument:

> Hunsberger first contends the trial court erred because subdivision (b)(2) of Civil Code section 1717 only applies where the entire action has been voluntarily dismissed, not just one cause of action or party. We reject Hunsberger's argument because it is inconsistent with the purpose of subdivision (b)(2) of Civil Code section 1717.

*Id.* at 1532.

For the foregoing reasons, the Association Defendants' motion for attorneys' fees is **DENIED**.[4]

**B. Motions to Dismiss**[5]

Defendants move to dismiss several of Plaintiff's causes of action: two antitrust violation claims, derivative claims for breach of fiduciary duty and waste of corporate assets, a claim for violation of California Corporate Code sections 1601 and 1602, breach of contract, and breach of the implied covenant of good faith and fair dealing.

//

---

[4] Because the Court finds the Association Defendants are not entitled to fees under section 1717, it declines to address Plaintiff's argument that the amount of fees Defendants request is unreasonable.

[5] Because all Defendants join in each other's arguments in support of their motions to dismiss, the Court will not differentiate between the two motions unless specified herein.

1    **i.    Alleged Procedural Error**

2         As an initial matter, the Association Defendants argue Plaintiff's FAC must be

3    dismissed because Plaintiff identified itself as Greater San Diego County Association of

4    Realtors in its original complaint and did not remedy its error in a procedurally proper

5    manner.  The Association Defendants argue that, under Federal Rule of Civil Procedure

6    15, only a *party* may amend its pleading, but Plaintiff San Diego Association of Realtors

7    was not a party to the case.  Thus, the amendment was improper, and Plaintiff did not

8    move to ratify, join, or substitute San Diego Association of Realtors pursuant to FRCP 17

9    or move to intervene pursuant to FRCP 24.

10        Plaintiff admits that it meant to sue under its fictitious business name "Greater San

11   Diego Association of Realtors" but mistakenly inserted "County" into its name.[6]

12   However, Plaintiff argues that Defendant has provided no case law in support of its

13   argument that the case should be dismissed on this basis.  Plaintiff asserts that where an

14   error is only in the name of a party and the true identity of the party is known to the other

15   parties, the law requires the pleading be corrected, not the action be dismissed.  Here,

16   Plaintiff states, it has corrected the pleading by properly amending its complaint pursuant

17   to FRCP 15(a)(1)(B).

18        The Court finds Defendants' argument that this entire action be dismissed based on

19   an alleged procedural error unpersuasive.  When Plaintiff filed the FAC, the Court issued

20   an Order stating that Plaintiff properly and timely filed an amended complaint under

21   FRCP 15(a)(1)(B) and that in doing so, the original complaint was rendered inoperative

22   and the FAC became the operative pleading.  [Doc. No. 20, citing *Forsyth v. Humana*,

23   114 F.3d 1467, 1474 (9th Cir. 1997); *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987).]

24   Defendants cite FRCP 17 and 24 for the proposition that Plaintiff should have substituted

25

26   _____

27   [6] Plaintiff also seeks judicial notice of a webpage illustrating that Plaintiff San Diego Association of
     Realtors owns the name "Greater San Diego Association of Realtors."  The Court need not take judicial
28   notice of this page in order to conclude that this case should not be dismissed based on Plaintiff's
     alleged procedural error.  Accordingly, Plaintiff's request for judicial notice is **DENIED AS MOOT**.

itself as the real party in interest or moved to intervene.  However, the operative complaint—the FAC—cured the defect by listing Plaintiff's correct name and thus there would be no reason for Plaintiff to do so.  Further, Defendants do not allege they have suffered any prejudice due to the mistake, and nothing in the record indicates differently.

Thus, the Court declines to dismiss Plaintiff's lawsuit based on its alleged procedural error.

### ii.    Plaintiff's Sherman Act and Cartwright Act Claims

Defendants move to dismiss Plaintiff's claims under the Sherman Act, 15 U.S.C. § 1, and the California Cartwright Act, Business & Professions Code, §§ 16600 et seq.[7]  Defendants contend that in antitrust cases, a plaintiff must have "antitrust standing," meaning Plaintiff must allege a non-speculative antitrust injury.  Defendants argue Plaintiff has failed to do so for two reasons.  First, Defendants argue Plaintiff has not alleged an injury because Plaintiff's allegations are contradictory regarding the amount of data Defendants allegedly withheld.  The Court finds the FAC sufficiently conveys Plaintiff's stance—that Plaintiff was restricted from obtaining some of the MLS data, specifically historical data, and that Defendants also attempted to keep its members' data from Plaintiff for use in its products.  Plaintiff alleges it only obtained access to 70% or less of the data and the data was limited to its own members' data.  Accordingly, Plaintiff's antitrust claims should not be dismissed based on Defendants' argument that the allegations in support are "contradictory."

Second, Defendants argue Plaintiff has not sufficiently shown it has antitrust standing because Plaintiff does not show Defendants' conduct injured either Plaintiff or competition.  Defendants argue that Plaintiff's allegations do not suffice to demonstrate harm to competition because Plaintiff does not allege the association members have been deprived of full access to Sandicor's MLS data.  Rather, Defendants note that Plaintiff

---

[7] In the FAC and throughout the parties' briefs, the parties treat Plaintiff's Cartwright Act claim as rising or falling with the Sherman Act claim.  Accordingly, the Court addresses them as such.

only alleges that it is unable to use all of the data for Plaintiff's Just Knock and Showing Suite platforms.  Further, Defendants contend that Plaintiff's allegation that Sandicor allows third-party syndicators to access the MLS data feeds undermines Plaintiff's assertion that Defendants' conduct harms consumers.

Plaintiff argues it has sufficiently pleaded an antitrust injury because it has alleged a per se antitrust violation by alleging facts amounting to a concerted refusal to deal, also known as a group boycott.  Plaintiff contends it need not show "actual anticompetitive effect" where it has alleged conduct falling into a per se category because the effect is presumed.  Alternatively, Plaintiff argues it has sufficiently alleged harm to competition by alleging Defendants have "harmed competition, deprived the marketplace of an independent center of decision-making, deprived a competitor of a supply necessary to effectively compete" and "harm[ed] competition [. . .] by excluding one of only three broker associations from effective competition."  [Doc. No. 34, citing FAC ¶ 36, 94.]  Further, Plaintiff alleges the facts in the FAC give rise to a restraint on competition because members want information about all property listings, and Plaintiff cannot assure its members that it can obtain and use all of the data for its services and products.

Section 1 of the Sherman Act prohibits unreasonable restraints of trade.  15 U.S.C. § 1; *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). "Private suits to enforce the Sherman Act are authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which provides that 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . .'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).  The Supreme Court has interpreted "any person" to mean any person who has suffered an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *Knevelbaard Dairies*, 232 F.3d at 987.  "If the injury flows from aspects of the defendant's conduct that are beneficial or

neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). To determine whether a plaintiff has antitrust standing, the Ninth Circuit considers several factors: (1) whether the plaintiff's injury is of "the type the antitrust laws were intended to forestall;" (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of duplicative recovery; and (5) the complexity of apportioning damages. *Knevelbaard Dairies*, 232 F.3d at 987.

The requirement that a plaintiff show antitrust standing is separate and independent of the requirement that a restraint of trade be "unreasonable." *See Atlantic Richfield Co.*, 495 U.S. at 342. To determine whether a practice *unreasonably* restrains competition, courts generally apply the "rule of reason," which requires the factfinder to weigh all of the circumstances of a case, including information about the relevant business, the restraint's history, nature, and effect, and whether the businesses have market power. *Leegin Creative Leather Products, Inc.*, 551 U.S. at 885–86. The purpose of the analysis is to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* at 886. In limited instances, courts do not apply the rule of reason to determine whether a restraint is unreasonable. Rather, courts have deemed some types of restraints to be unlawful per se. *Id.* A restraint will only be considered per se unreasonable if it "always or almost always tend[s] to restrict competition and decrease output" and lacks redeeming value. *Id.* (internal quotations omitted). Per se restraints "are viewed as being so inherently anticompetitive as to warrant perfunctory antitrust condemnation without inquiry into their actual market impact or possible competitive justification." Holmes and Mangiaracina, Antitrust Law Handbook § 2:10; *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.*, 710 F.2d 1366, 1372 (9th Cir. 1983).

Accordingly, Plaintiff's argument that it need not prove "anticompetitive effect" for a per se violation misses its target. Defendants move to dismiss Plaintiff's antitrust claims based on lack of antitrust standing. Whether Plaintiff needs to prove

anticompetitive effect is relevant to the reasonableness of Defendants' conduct, not Plaintiff's standing.  In other words, Plaintiff is required to show it has suffered an antitrust injury regardless of whether it alleges a per se violation.[8]  *See Atlantic Richfield Co.*, 495 U.S. at 342 ("We also reject respondent's suggestion that no antitrust injury need be shown where a *per se* violation is involved.").  The focus of an antitrust standing inquiry is a plaintiff's own injury.  However, in their briefing, both parties almost exclusively focus on whether Plaintiff has shown harm to competition.

Upon its own inquiry into Plaintiff's allegations pertaining to antitrust standing, the Court finds Plaintiff's allegations regarding how it has been injured are insufficient.  The FAC states Defendants' actions "have stifled Plaintiff's efforts to provide the innovations it has invested time and money developing, including Just Knock and Showing Suite." [FAC ¶ 35.]  Further, "Plaintiff has lost members and has not obtained new members it would have obtained but for the flagrant misconduct of the Association Defendants." [*Id.*]  The Association Defendants' and Ray Ewings's conduct have "deprived [Plaintiff] of a supply necessary to effectively compete."  [FAC ¶ 36.]  Plaintiff alleges it does not have a reasonable alternative source of the data, as Defendants have interfered with Plaintiff's ability to obtain the information from third parties.  [FAC ¶ 37.]  Based on such vague and conclusory allegations, the Court finds it difficult to examine how Plaintiff has been harmed or determine the causal link between Defendants' specific conduct and Plaintiff's particular injuries.  For example, it is unclear what Plaintiff means by "stifled Plaintiff's efforts."  The FAC states that Just Knock was a success when it launched, but it does not state whether the platform became less successful after Plaintiff's access to Sandicor's MLS data was restricted, or if so, how.  The FAC is

---

[8] Further, the type of per se violation Plaintiff alleges occurred here—group boycotts, also described as a concerted refusals to deal—are often, but not always, considered per se restraints.  *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293–94 (1985); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).  "Exactly what types of activity fall within the forbidden category [of group boycotts] is [] far from certain."  *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 294.

essentially devoid of any factual allegations regarding the effects that any of Defendants'
actions had on Showing Suite.  Plaintiff does not describe in sufficient detail if or how it
has lost money.  It is unclear whether Plaintiff has attempted to obtain the MLS data it
claims it has been wrongfully deprived of from another third-party syndicator other than
Point2, or whether Plaintiff merely assumes such efforts would be futile.  Moreover, the
FAC is vague as to how or why Plaintiff has lost members and was unable to obtain new
members.  Specifically, Plaintiff does not specify what particular aspects of Defendants'
conduct purportedly affected Plaintiff's membership.  To allege it has standing, Plaintiff
must more clearly link the aspects of Defendants' conduct that are purportedly
anticompetitive with Plaintiff's harm.  As currently drafted, the FAC does not sufficiently
demonstrate that Plaintiff has suffered an "injury of the type the antitrust laws were
intended to prevent and that flows from that which makes defendants' acts unlawful," let
alone adequately plead an injury that is sufficiently direct and non-speculative.  *See
Atlantic Richfield Co.*, 495 U.S. at 334; *Knevelbaard Dairies*, 232 F.3d at 987.

   For the foregoing reasons, the Court **GRANTS** Defendants' motions to dismiss as
to Plaintiff's claims under the Sherman Act and the Cartwright Act **WITHOUT
PREJUDICE**.  As a final matter, the Court notes that, in granting Defendants' motions
to dismiss Plaintiff's antitrust claims, the Court did not consider Defendants' argument
that Plaintiff does not sufficiently plead a conspiracy, as Defendants improperly raised
that argument for the first time in their reply brief.  *United States v. Boyce*, 148 F. Supp.
2d 1069, 1085 (S.D. Cal. 2001), *amended* (Apr. 27, 2001), *aff'd*, 36 F. App'x 612 (9th
Cir. 2002) (stating courts generally decline to consider arguments raised for the first time
in reply briefs because in such cases, opposing parties are deprived of adequate
opportunity to respond).

### iii. Plaintiff's Derivative Claims

   Defendants argue Plaintiff's derivative claim for breach of fiduciary duty fails
because there is no fiduciary duty running from the Association Defendants to Sandicor
and the Association Defendants do not have the right to act on Sandicor's behalf.

Defendants argue that a corporation's shareholders are not proper defendants in derivative claims based on acts undertaken by the corporation because the board of directors manages the corporation.  Plaintiff argues that controlling shareholders are proper defendants in derivative suits and controlling shareholders also owe fiduciary duties to minority shareholders and the corporation.  Plaintiff alleges the Association Defendants are controlling shareholders because together they control the board.

As an initial matter, it is improper for Defendant Sandicor to challenge a derivative action filed on its own behalf.  Derivative suits seek to redress a corporation's injuries where the board of directors has not done so, and the corporation reaps any benefits of the lawsuit, not the plaintiff.  *Grosset v. Wenaas*, 42 Cal. 4th 1100, 1108 (2008).  As a formality, the corporation is an indispensable party to derivative actions and must be included as a nominal defendant.  *Id.*  However, because the corporation stands to benefit from the action, "the corporation has no ground to challenge the merits of a derivative claim filed on its behalf and from which it stands to benefit."  *Patrick v. Alacer Corp.*, 167 Cal. App. 4th 995, 1005 (2008).  To allow the corporation to challenge the merits of a derivative suit would be to allow the alleged tortfeasors to "shift the cost of their defense of the derivative suit to the corporation against which they have allegedly committed tortious conduct."  *Id.* at 1007–08 (internal alterations omitted) (quoting *Sobba v. Elmen*, 462 F. Supp. 2d 944, 950 (E.D. Ark. 2006)).  Thus, as to Defendant Sandicor, the motion to dismiss is **DENIED**.

However, because the Association Defendants filed a notice of joinder to join in Defendant Sandicor's arguments, the Court turns to the merits of the arguments raised in support of dismissal of the derivative claims.  "Majority" or "controlling" shareholders may be proper defendants in derivative actions.  Contrary to Defendants' assertions otherwise:

> California Courts have often recognized that majority
> shareholders, either singly or acting in concert to accomplish a
> joint purpose, have a fiduciary responsibility to the minority

and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner. Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority.

*Neuburger v. San Francisco Network, Inc.*, No. A125443, 2011 WL 3503307, at *6 (Cal. Ct. App. Aug. 10, 2011) (internal quotations omitted) (quoting *Jones v. H.F. Ahmanson & Co.*, 460 P.2d 464, 471 (Cal. 1969)); *see also Nelson v. Anderson*, 72 Cal. App. 4th 111, 127 (1999), *as modified on denial of reh'g* (June 14, 1999) (finding a minority shareholder should have brought a derivative action on behalf of the corporation, instead of a direct action, for redress for the majority shareholder's alleged wrongdoing). "The breadth of the fiduciary duties of controlling shareholders and directors to the corporation and its other shareholders has been described by our Supreme Court as 'extensive.'" *Neuburger*, 2011 WL 3503307, at *6.

Defendant does not argue that the Association Defendants are not controlling shareholders, but rather argues that even assuming that they are and that they owe a fiduciary duty to the corporation, they are not liable for acts taken by the directors they appointed. However, Defendant cites no pertinent case law in support of that proposition and the Court has found case law indicating otherwise. For example, the court of appeal in *Neuburger* stated that majority shareholders may not use their "*ability to control*" corporate activities in a manner that breaches their fiduciary duties to the corporation and minority shareholders. 2011 WL 3503307, at *6 (emphasis added). Plaintiff repeatedly pleads that the Association Defendants committed the allegedly wrongful conduct through their control of the board of directors. Plaintiff refers to the board as "the Association Defendants-controlled board." [FAC ¶ 31.] Accordingly, Plaintiff sufficiently alleges that the Association Defendants controlled or caused the actions of the board members that they appointed.

For the foregoing reasons, the Court **DENIES** Defendants' request for dismissal of Plaintiff's derivative claims for breach of fiduciary duty and waste of corporate assets.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### iv.   Plaintiff's Claims Under Corporate Code Sections 1601 and 1602

Defendants move to dismiss Plaintiff's claims arising under California Corporations Code sections 1601 and 1602. With respect to Plaintiff's section 1601 claim, Defendants argue that Plaintiff does not allege a violation of section 1601 because it does not allege "the inspection was to take place usual business hours [sic]." [Doc. No. 26, p. 18.] Further, Defendants contend Plaintiff alleges it was denied access to "a far broader range of records," outside the scope of section 1601. [Doc. No. 26, pp. 18–19.] Lastly, Defendants state Plaintiff does not allege a purpose for its inspection and that 1601 is limited to inspections "reasonably related" to the shareholder's rights. Plaintiff argues it has sufficiently stated a cause of action for a violation of section 1601 because Plaintiff is a shareholder and alleges it was denied information it was entitled to inspect, including Sandicor's financial data.

The Court finds Plaintiff has sufficiently stated a claim for a violation of section 1601. Section 1601(a) states, in pertinent part:

> The accounting books and records and minutes of proceedings of the shareholders and the board and committees of the board of any domestic corporation, and of any foreign corporation keeping any such records in this state or having its principal executive office in this state, shall be open to inspection upon the written demand on the corporation of any shareholder or holder of a voting trust certificate at any reasonable time during usual business hours, for a purpose reasonably related to such holder's interests as a shareholder or as the holder of such voting trust certificate.

Plaintiff states it has made repeated written demands on Defendant Sandicor to make available documents which it is entitled to inspect. Defendants' argument that Plaintiff did not specify that "the inspection was to take place [during] usual business hours" is unconvincing. The statute's language regarding business hours relates to *the corporation's* duty to make available the required documents at reasonable times during

business hours, in response to a proper demand.  *See Jara v. Suprema Meats, Inc.*, 121 Cal. App. 4th 1238, 1263 (2004).  The Court does not interpret the language to mean that a party requesting inspection must explicitly demand that documents be made available during reasonable business hours, let alone to mean that in order to state a claim for a violation of section 1601, a Plaintiff must explicitly state that they did so.

Moreover, Defendants' argument that Plaintiff's claim fails because Plaintiff states it was deprived of more than it is entitled to inspect is also unpersuasive.  So long as Plaintiff states it was denied inspection of some documents it was entitled to inspect, Plaintiff has stated a claim under section 1601.  Plaintiff alleges she was deprived of inspecting "[t]he targeted documents relat[ing] to the implemented data share agreement and negotiations regarding the potential merger with CRMLS and in connection with the ongoing operation of SANDICOR, including without limitation the terms of the merger discussions and the financial data of SANDICOR."  [FAC 116.]  Under section 1601, Plaintiff is entitled to inspect "accounting books and records and minutes of proceedings of the shareholders and the board and committees of the board."  Plaintiff's requests encompass at least some of the types of documents (accounting books and records, for example) it has a right to inspect.  Further, the requests are reasonably related to its status as a majority shareholder, as they pertain to the general management of the corporation as well as potential significant changes to the corporation—for example, a merger.

Regarding Plaintiff's claim under section 1602, Defendants state section 1602 is inapplicable to Plaintiff because it only governs inspection rights of directors and Plaintiff is a shareholder, not a director.  The Court agrees.  Plaintiff has no rights under section 1602.

For the foregoing reasons, the Court **DENIES** Defendants' motions to dismiss as to Plaintiff's claim under section 1601 and **GRANTS** Defendants' motions as to Plaintiff's section 1602 claim.  Plaintiff's claim under section 1602 is **DISMISSED WITH PREJUDICE**.

*//*

**v.    Plaintiff's Breach of Written Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Claims**

Defendants request the Court dismiss Plaintiff's causes of action for breach of written contract and breach of the implied covenant of good faith and fair dealing. Defendants assert that Plaintiff's breach of contract claim fails because Plaintiff alleges a contractual right that does not exist under the contract Plaintiff alleges was breached. Specifically, Defendants argue that under the Service Center Agreement, Plaintiff only has the right to re-sell the MLS data "as a wholesaler" to its members, not to access or use it, such as for its platforms Just Knock and Showing Suite. Further, Defendants allege that under Sandicor's Rules & Regulations, Plaintiff does not fall within nor allege it falls within any of the categories of individuals or entities eligible to access the MLS data for their own use. Defendants request judicial notice of the Rules & Regulations, arguing they are available on Sandicor's website and are thus properly judicially noticeable. [Doc. No. 26-1, 12, n.5.]

For the above reasons, Defendants argue that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails. Defendants admit the contract contains an implied covenant, but argues that it cannot be extended to create rights that were not contemplated by the parties to the contract, such as a right to unrestricted access to Sandicor's MLS data.

Plaintiff argues that, under the Agreement, it clearly has the right to choose the manner in which it transmits MLS data to its members. However, even if the Court finds the contract language ambiguous, the Court should not dismiss its claims because it is premature for the Court to determine the meaning of contract terms at this stage. Plaintiff opposes the dismissal of its breach of the implied covenant of good faith and fair dealing claim for the same reasons. Plaintiff also opposes judicial notice of the Rules & Regulations, but argues that they do not trump the provisions of the Service Center Agreement that give Plaintiff the right to provide MLS data access to its members.

Under California law, where contract language is unambiguous, the Court can

resolve breach of contract claims on a motion to dismiss. *Bedrosian v. Tenet Healthcare Corp.*, 208 F.3d 220 (9th Cir. 2000); *Monaco v. Bear Stearns Residential Mortgage Corp.*, 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008). However, "a motion to dismiss should not be granted where the contract 'leaves doubt as to the parties' intent.'" *Velazquez v. GMAC Mortg. Corp.*, 605 F.Supp.2d 1049, 1069 (C.D. Cal. 2008) (quoting *Consul Ltd. v. Solide Enterprises, Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986). A contract term is ambiguous where there are two reasonable interpretations. *Monaco*, 554 F. Supp. 2d at 1040.

Here, Plaintiff and Defendants disagree over Plaintiff's rights under the Service Center Agreement. The Court finds both parties' interpretations of the contract language to be reasonable. The Service Center Agreement states that Plaintiff ("Association") has been providing "MLS-related support services" to licensed professionals that qualify to participate in Sandicor's MLS. [Doc. No. 26-2, Exh. 2.] The Agreement states:

> During the Term, Association shall function as a Service Center for the benefit of the Customers. In its capacity as a Service Center, Association shall provide all of the services described on Exhibit "A" attached hereto (the "Services"). [. . . ] As partial consideration for providing the Services, during the Term Association is hereby granted the right to provide access to the MLS to those particular Customers which elect to use the Services through the Association.

[*Id.*] The meaning of "provide access" is unclear.

Further, Exhibit A to the Agreement sheds little light on the matter. It lists services such as signing up new customers, transmitting customer information to Sandicor, and providing lockbox services such as issue keys to new customers, issuing replacement keys, giving "instructions on use of Supra system," selling keyboxes, and repair boxes. [*Id.*] It does not mention MLS data.

//

//

1

2

The Agreement also states:

3

> SANDICOR has given Association permission to download, use and distribute SANDICOR's MLS data for membership consumption and for statistical purposes. However, Association shall not sell, market or license any of SANDICOR's MLS data (including but not limited to Customer lists) for any purpose without first obtaining SANDICOR's written consent, which shall not be unreasonably withheld.

[Doc. No. 26-2, Exh. 2.]  Again, it is unclear what meaning the parties intended to ascribe to "download, use and distribute" or "sell, market, or license."  Even considering the Rules & Regulations in conjunction with the Agreement, the Court finds the contractual language ambiguous regarding Plaintiff's right to use Sandicor's MLS data in the manner it wished to for its Just Knock and Showing Suite platforms.  Thus, the Court **DENIES** Defendants' request for dismissal of Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims.

Regarding Defendants' request for judicial notice of Sandicor's Rules & Regulations, publically accessible websites may be judicially noticed on a motion to dismiss.  *See Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014).  Plaintiff argues against judicial notice on relevance grounds, but does not contest the website's authenticity.  The Rules & Regulations are relevant, as they are mentioned several times within the Service Center Agreement.  Accordingly, the Court **GRANTS** Defendants' request for judicial notice of the Rules & Regulations.

//

//

//

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>CONCLUSION</u>

For the above reasons, the Association Defendants' motion for attorneys' fees is **DENIED**.  [Doc. No. 25.]  The Defendants' motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**.  [Doc. Nos. 24, 26.]  Plaintiff's request for leave to amend the Complaint is **GRANTED** as to claims that are dismissed <u>without</u> prejudice. Plaintiff may not reallege claims that have been dismissed with prejudice, nor may it amend the Complaint to add parties or new claims without first seeking permission from the Court.  Plaintiff has **<u>14 days</u>** from the date of this Order to file a Second Amended Complaint.

**IT IS SO ORDERED.**

Dated:  May 25, 2016

Hon. Michael M. Anello
United States District Judge