ALEXIS S. GUTIERREZ, ESQ. (Bar No. 190487)
agutierrez@higgslaw.com
EDWIN M. BONISKE, ESQ. (Bar No. 265701)
boniske@higgslaw.com
GEOFFREY M. THORNE, ESQ. (Bar No. 284740)
thorneg@higgslaw.com
HIGGS FLETCHER & MACK LLP
401 West "A" Street, Suite 2600
San Diego, CA 92101-7913
TEL: 619.236.1551
FAX: 619.696.1410

PETER K. SOLECKI, ESQ. (Bar No. 159742)
psolecki@larsonsolecki.com
LARSON & SOLECKI LLP
2366 Front Street, San Diego, CA 92101
TEL: 619.231.8300, ext. 227
FAX: 619.231.8320

Attorneys for Plaintiff
SAN DIEGO ASSOCIATION OF REALTORS®

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO ASSOCIATION OF REALTORS®, a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SANDICOR, INC., a California Corporation; NORTH SAN DIEGO COUNTY ASSOCIATION OF REALTORS®, a California Corporation, PACIFIC SOUTHWEST ASSOCIATION OF REALTORS®, a California Corporation, and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. 16-CV-00096-MMA-KSC<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>**1. Violation of the Sherman Act;**<br>**2. Violation of the Cartwright Act;**<br>**3. Direct Claim for Breach of Fiduciary Duty by Controlling Shareholders;**<br>**4. Derivative Claim for Breach of Fiduciary Duty;**<br>**5. Derivative Claim for Waste of Corporate Assets;**<br>**6. Direct Claim for Violation of Corporations Code sections 1601;**<br>**7. Violation of Unfair Competition / Business Practices;**<br>**8. Breach of Written Contract;**<br>**9. Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br>**10. Intentional Interference with Contractual Relations; and,**<br>**11. Declaratory Judgment**<br><br>**[DEMAND FOR JURY TRIAL]** |

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

Plaintiff SAN DIEGO ASSOCIATION OF REALTORS® ("Plaintiff")

hereby alleges and states as follows:

<h1 style="text-align:center">I.</h1>

<h1 style="text-align:center"><u>NATURE OF THE CASE</u></h1>

1. Defendants PACIFIC SOUTHWEST ASSOCIATION OF REALTORS® ("PSAR") and NORTH SAN DIEGO COUNTY ASSOCIATION OF REALTORS® ("NSDCAR") (collectively, the "Association Defendants") are direct competitor who have coordinated with one another, both bilaterally and through their joint domination of a multiple listing service to deprive Plaintiff of members, services, and essential resources in an ongoing effort to exclude Plaintiff, their only other competitor, in the relevant market.

2. Plaintiff and the Association Defendants are the sole shareholders of Defendant SANDICOR, INC. ("Sandicor"), San Diego County's multiple listing service ("MLS"). Although Plaintiff owns a supermajority of Sandicor's outstanding shares and contributes most of Sandicor's funding, Sandicor's board is controlled by the Association Defendants. They have used this position of power to wield Sandicor as an anticompetitive weapon, milked its resources for their own enrichment, and frustrated its purpose, all while actively preventing Plaintiff from participating in corporate decisions.

3. The Association Defendants, as minority members but controlling shareholders of Sandicor, have also breached their fiduciary duties to Plaintiff by acting in their own interest and operating Sandicor for their sole benefit, to the detriment of Plaintiff and Sandicor. The conduct of the Association Defendants, as well as the directors they have respectfully appointed to Sandicor's board of directors, has also significantly devalued Sandicor's assets and given rise to other corporate waste. In addition, they collectively have caused Sandicor to breach its contractual duties to Plaintiff by unjustifiably refusing to provide Plaintiff access to its *own* data. By this action, and as a result of the Association Defendants'

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

wrongful, anticompetitive, and unlawful conduct, Plaintiff seeks monetary damages and declaratory relief.

## II.

## THE PARTIES

4.      Plaintiff SAN DIEGO ASSOCIATION OF REALTORS® is a California corporation with its principal place of business in San Diego, California. Plaintiff was one of the founding shareholders of Sandicor, and currently owns more than two-thirds of Sandicor's shares.

5.      Defendant NORTH SAN DIEGO COUNTY ASSOCIATION OF REALTORS® is a California corporation with its principal place of business in Vista, California.  At all times relevant hereto, NSDCAR has been a minority shareholder of Sandicor, holding approximately 22% of its outstanding shares.

6.      Defendant PACIFIC SOUTHWEST ASSOCIATION OF REALTORS® is a California corporation with its principal place of business in Chula Vista, California.  At all times relevant hereto, PSAR has been a minority shareholder of SANDICOR, holding approximately 10% of its outstanding shares.

7.      Defendant SANDICOR, INC. is a California corporation with its principal place of business in San Diego, California. Sandicor was formed for the sole purpose of consolidating several different multiple listing services into one consolidated database.

8.      The true names and capacities of defendants DOES 1 through 20, inclusive, whether individual, corporate, associate or otherwise, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names and will amend to allege their true names and capacities when ascertained.  Plaintiff is informed and believes that each of the DOE defendants is responsible for the acts or omissions alleged in this complaint, and that Plaintiff's injuries and damages were proximately caused by the acts or omissions of these unnamed defendants.

/ / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

2

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

9.      Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants herein was at all relevant times the principal, agent, alter-ego, joint-venturer, partner, affiliate, manager, subsidiary, servant, employee and/or co-conspirator of each other Defendant, and in performing the acts described in this complaint, was acting in the scope of his, her or its authority with the consent of each other Defendant.  Each Defendant ratified and/or authorized the wrongful acts, conduct, omissions, or commissions of each of the other Defendants.  At all relevant times, each Defendant acted with full knowledge of the conduct of each of the other Defendants, with the intention to cooperate therewith.

10.      The Association Defendants (PSAR and NSDCAR) and Sandicor are referred to collectively herein as "Defendants."

## III.

## JURISDICTION AND VENUE

11.      This Court has primary subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, because this action arises under the antitrust laws of the United States of America.

12.      This Court has supplemental jurisdiction over the state law claims of this complaint under 28 U.S.C. § 1367 because the causes of action arise from the same nucleus of operative facts as the federal claims such that they form part of the same case or controversy.

13.      All relevant acts constituting the antitrust violation alleged in this action occurred within the judicial district of this Court.  Venue is proper in the District Court for the Southern District of California under 28 U.S.C. § 1391(b) and 15 U.S.C. §§ 15, 22.

/ / /

/ / /

/ / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

3

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

## SUBSTANTIVE ALLEGATIONS

14.     Plaintiff is an association of real estate brokers.  Its innovations in the services and products it offers to its members are directly correlated with its success in the fiercely competitive market for real estate broker and salesperson members in San Diego County.

15.     That success has, over time, allowed Plaintiff to boast the highest membership numbers amongst any of the other associations in the marketplace. PSAR and NSDCAR, also competitors in a region that once included eleven associations, have banded together to use their control of the Sandicor board of directors and the company's assets to unjustifiably restrict and, in some instances, exclude Plaintiff from accessing the MLS data feeds that are fundamental to the products and services to which all three associations owe their success.

16.     Sandicor was formed in 1991 by eleven broker associations in San Diego County for the express purpose of aggregating the previous associations' separate MLSs to one centralized MLS with an online database accessible to all local brokers. The centralized database was designed with multiple access points and association uses in mind—all to serve the associations, brokers, and consumers of San Diego County. It was created for and exists for the sole purpose of aggregating MLS data.

17.     Using Sandicor's consolidated MLS, members of the various shareholder associations can create MLS listings by inputting the required information directly into Sandicor's database.  Once that is done, the listing will be included in the MLS database that can then be reviewed by other real estate brokers (*i.e.*, members of the associations and other subscribers).  Sandicor's MLS database is not limited to current listings, but also contains historical information regarding sold properties that is critical to analyzing property values and market comparables.

/ / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

4

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

18. The MLS data is of fundamental value to Sandicor's shareholder associations; so fundamental that the associations created Sandicor as a vehicle to consolidate and share the information.

19. This aggregated data feed has turned out to be more crucial than could have been imagined at the time of Sandicor's incorporation in 1991. As with many industries, the real estate industry's drive to create online, technology-driven products and services for brokers and consumers exploded exponentially. The products and services of associations and third-party vendors rely on the integration of MLS data feeds and other aspects of the MLS platform for nearly all their utility. The innovation and implementation of these products and services is a primary area in which Plaintiff and the Association Defendants effectively compete, because Realtors join associations primarily for the benefit of these products and services.

20. Indeed, a recent CAR publication opened with the following: "Since Board of Choice was implemented many years ago, Associations have competed for membership based on price, quality and service to increase their membership numbers without regard to where members' offices are located." That is, associations of realtors are competitors just like competitors in any other market. Associations compete for members with other associations, just as members compete amongst themselves. The antitrust laws limit associations' scope of action in working together—even where they have business or other interests in doing so.

21. Competition and innovation regarding MLS data and its presentation is important. Buying a home is the largest financial transaction most Americans will ever undertake—and the internet has revolutionized the real estate industry. According to a 2011 National Association of Realtors study, as many as 88% of home buyers use the internet as a resource when buying a home. Specifically, "they generally start their search process online and then contact an agent." The MLS data is an essential input to internet and mobile products that incorporate that data into a broader platform, each with its own functions and advantages. Plaintiff

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

and the Association Defendants compete to offer their members such platforms, as well as other membership advantages.

22. MLS data is a fundamental prerequisite to effective competition in real estate markets in the digital era. To that end, the Department of Justice and the Federal Trade Commission jointly reported in 2007 that "MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in a local MLS ... . Because brokers usually set rules for each other's participation in the MLS, it is possible for one dominant group of brokers to establish rules that disfavor other brokers who compete in a manner they dislike."

23. Despite their collective nature, courts have recognized MLS services to be procompetitive, provided that they allow the free flow of information in a manner that enhances competition rather than restricts it or discriminates against particular participants. Indeed, MLS's are now an essential facility which enables associations and third parties to compete to provide new ways to harness and use MLS data for the benefit of their members and the public alike.

24. The Association Defendants' conspiracy, as described below, has the unlawful object to eliminate this competitive threat—innovation in the delivery of MLS information—and, ultimately, to eliminate their only other competitor in the market for broker-member services. As set forth below, their collusive actions have stifled Plaintiff's efforts to provide the innovations it has invested time and money developing. Plaintiff has lost members and has not obtained new members it would have obtained but for the flagrant misconduct of the Association Defendants.

## THE RELEVANT MARKET AND MARKET POWER

25. The market from which Plaintiff has been excluded is the market for real estate listing information, which in turn has prevented Plaintiff from effectively competing in the market for real estate salespersons and broker members. Sandicor, like other MLSs throughout the nation, is a local cooperative owned by

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

7633416.1

its shareholders: Plaintiff and the Association Defendants. Sandicor pools and disseminates information on homes available for sale within its area of operation from the member-brokers of the three associations, who are required to submit this information as participants in the MLS. Sandicor combines this data and makes it available to its member-brokers in real time. It is also responsible for maintaining a feed of current and historical data for the associations and third-party syndicators.

26. San Diego County is the relevant geographic market and is the area of effective competition between Plaintiff and the Association Defendants. Additionally, Sandicor's MLS covers listings in and only in San Diego County. Realtors in San Diego County will almost exclusively join one or more of Plaintiff or the Association Defendants, as their local Realtor association. The associations fiercely compete for members, and typically do not have many members outside of San Diego County.

27. Sandicor possesses unique access to MLS data for San Diego County, which is a resource necessary for Plaintiff to effectively compete. Sandicor has market power because it comprises 100% of the market for consolidated MLS data for San Diego County. The Association Defendants hold a dominant position in the market by way of their control of Sandicor's board of directors. That is, the Association Defendants are a group of competitors with separate and independent economic interests with sufficient leverage to force another (Sandicor) to boycott a competitor at the same level of distribution (Plaintiff). As alleged below, however, the Association Defendants have unlawfully combined and conspired to act as one (though carefully maintaining a fiction of "separateness" to maintain control over Sandicor and the critical MLS data), such that there are effectively only two competitors in the marketplace: Plaintiff and PSAR/NSDCAR.

## THE SHAREHOLDER AGREEMENT

28. As part of the formation of Sandicor, each of the associations made compromises and concessions in terms of Sandicor's structure and governance.

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

1   That governance model is now codified in the Second Amended and Restated

2   Shareholder Agreement (the "Shareholder Agreement") dated May 10, 1999.

3       29.    The Shareholder Agreement provides in pertinent part for voting rights

4   as follows:

5           1.1.   Each share of capital stock of SANDICOR shall
            entitle the holder to one vote on all matters presented to
6           the Shareholders, except as provided in Section 3.1
            below.
7                                       * * * * *

8           2.2    The number of Shares held by each Shareholder
            shall be determined on April 1 of each year and shall be
9           equal to the total number of REALTOR® members on
            such date of such Shareholder, as published by the
10          California Association of REALTORS.

11      30.    The Shareholder Agreement further states the board of directors for

12  Sandicor shall be appointed by its shareholders.  Each association may appoint two

13  directors with up to four votes for every 750 members; however, there is a limit of

14  two directors, with four total votes, per each shareholder association.

15      31.    For any major corporate actions (including any decisions relating to

16  Sandicor's corporate or organizational structure), the Shareholder Agreement

17  requires approval of at least two-thirds of the outstanding shares, cast by at least

18  two separate shareholders.  In other words, at least two shareholders must approve

19  of all significant corporate activities regardless of voting power accumulated

20  through shares of stock; conversely, a shareholder owning more than two-thirds of

21  the shares may veto any proposal requiring shareholder approval.

22      32.    There were five trade associations in existence at the time the

23  Shareholder Agreement was prepared and executed, but now there are only three.

24  More specifically, through a series of mergers by the associations, the only

25  remaining shareholders of SANDICOR are: (*a*) Plaintiff; (*b*) NSDCAR; and (*c*)

26  PSAR.  The board of directors is comprised of six people, two of which are

27  provided by each of the shareholder associations.

28  / / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

8

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

33.     Notwithstanding the drastic shift in the composition of Sandicor's members, its governance model has not changed since the Shareholder Agreement was revised in 1999.  Thus, although it currently holds more than two-thirds of Sandicor's stock (based on its membership size), and thereby provides more than two-thirds of Sandicor's operational funding (generated through membership dues), Plaintiff only has four-elevenths of the voting power at the director level (under the formula, PSAR's two directors have three votes collectively, NSDCAR's two directors have four votes collectively, and Plaintiff's two directors also have four votes collectively).  As such, Plaintiff is unable to undertake any actions that would constitute a significant corporate decision without approval or cooperation of the Association Defendants—despite owning over two-thirds of the entity.

34.     To illustrate, Plaintiff, acting as the supermajority shareholder, has formally challenged Sandicor regarding the approval of certain large dollar value contracts, and the continued appointment of particular officers.  To date, Plaintiff's formal challenges to the related actions by the Association Defendants and Sandicor have been ignored, bypassed, and their collective rights have been usurped.

35.     More troubling, Plaintiff, acting as the supermajority shareholder, has also formally challenged the contract and continued employment of Sandicor's CEO, Ray Ewing.  Ray Ewing is employed with Sandicor pursuant to an agreement that provides for automatic (one-year) renewal absent a vote and notification of the Sandicor board of directors before the end of each one-year term.  Plaintiff, acting as the supermajority shareholder, has opposed renewal of Ray Ewing's contract, but has been unable to be heard by the current board.  In fact, Ray Ewing himself wrote an amendment that was adopted to prevented a vote on his continued employment.  Exacerbating the fundamental unfairness, Plaintiff is without recourse to address, let alone remedy, Ray Ewing's actions alleged herein because the board is controlled by the Association Defendants, and they are beneficiaries of Ray Ewing's misconduct, as alleged herein.

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

## THE SERVICE CENTER AGREEMENT

36.     On or about February 17, 1999, Sandicor entered into a written contract with Plaintiff wherein it was agreed that it would provide various MLS-related support services to certain professionals in the real estate industry.  The parties amended and restated that agreement on January 15, 2004 (the "Service Center Agreement").  Under the Service Center Agreement, and in exchange for monthly payments, Sandicor agreed to provide access to its MLS data to Plaintiff to "download, use and distribute … for membership consumption and statistical purposes."  That is, the Service Center Agreement conferred on Plaintiff the right to access and use Sandicor's MLS data.

37.     However, as explained below, Sandicor has materially breached the Service Center Agreement by refusing to provide Plaintiff unrestricted access to the MLS data despite repeated requests (thereby preventing Plaintiff from using the information or effectively operating the Just Knock platform for membership consumption).

## THE ASSOCIATION DEFENDANTS' MISUSE OF SANDICOR

38.     Sandicor (and its consolidated MLS database) were created for the benefit of all of the shareholders, not any particular association(s).  Exclusion of one or more associations or sets of real estate brokers from accessing the MLS database could be particularly harmful because access to MLS information is essential for all competing parties.  However, the Association Defendants have acted in concert to operate Sandicor—through their control of the board of directors—in favor of their respective associations and to the detriment of Plaintiff.  Specifically, rather than trying to compete directly with Plaintiff, the Association Defendants have opted, instead, to combine to utilize Sandicor to provide benefits and services to their respective associations at the expense of Plaintiff and over its objection.

/ / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

39.     As described in more detail below, in 2009, Plaintiff began taking steps to create the Just Knock web-portal so that its members can provide clients with access to a hyper-local community resource to assist in the home buying process.  Plaintiff devoted substantial time and resources to create the web-portal, and was prepared to roll the service out in 2015 once it secured an unrestricted data feed to Sandicor's MLS database—including access to the historical information. This should not have been a problem, as Plaintiff had a contractual right to download and use the data as well as the fact that Sandicor freely provided data feeds to requesting parties, often through third-party sources.  Instead, the Association Defendants, through their collective control at the director level for Sandicor and other means, combined to deny Plaintiff access to the data feed. In addition, the Association Defendants also jointly convinced a third-party syndicator (Point2) to refuse to provide an MLS data stream to Plaintiff.

40.     While stifling Plaintiff's efforts to complete the web-portal by refusing to provide current and historical MLS data (notwithstanding that the MLS information was generated, in large part, by Plaintiff's members), as alleged below, the Association Defendants also uniformly demanded the "opt-out" of their respective members' data (their Realtor members' data) from the syndication feed, thereby significantly reducing the data feed Plaintiff received by 30 percent.  The primary purpose of this decision was to reduce the value of the data feed to Plaintiff so Plaintiff could not offer services and products that would compete for their members.  At the same time, however, the Association Defendants permitted other consumer facing websites (like the San Diego Union Tribune) to access Sandicor's data feed claiming "those sites are not in competition with us."  In other words, rather than devoting their own resources to producing a web-portal for the benefit of their own members, the Association Defendants impermissibly used their control of Sandicor to create a website that directly competes with Plaintiff's web-portal, at great expense and over Plaintiff's objection, for their sole benefit.

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

7633416.1

41.    Plaintiff, through its two directors, consistently opposed the use of Sandicor's resources to create a consumer portal that competed with the web-portal it designed, as that type of activity was beyond the scope of Sandicor's duties and was the exclusive responsibility of the associations.

42.    Because of the significant costs associated with the project, the development of Sandicor's web-portal constituted a "Major Corporate Resolution" as defined by the Shareholders Agreement and required approval of two-thirds vote from the shareholders.  In theory, Plaintiff, as the supermajority shareholder, should have been able to prevent the Association Defendants from developing a competing web-portal that was predominantly funded by Plaintiff and utilized the subscriber data provided by Plaintiff's members.  However, knowing Plaintiff opposed this project, and conscious that Plaintiff had the right to approve or reject major capital expenditures, the Association Defendants acted in concert and through Sandicor to structure the proposal for the website development such that the individual payments fell below the threshold for shareholder approval ($25,000).  But for their collusion and self-interested actions, Plaintiff would have had the right to reject the capital expenditure outright.  As a result, the Association Defendants caused Sandicor to incur more than $75,000 (in funds that are derived, largely, from Plaintiff's membership) for the sole benefit of the Association Defendants and to the detriment of Plaintiff.

43.    The Association Defendants have also used their control of the board of directors for Sandicor to provide educational programs, products and services at great expense for their benefit, that are typically provided by individual associations for their members.  Indeed, Plaintiff provides these types of services to its members, and has incurred substantial time and expenses in developing these services.  Rather than incurring the expense of providing these services themselves, the Association Defendants opted to, instead, use Sandicor's funds (which, again, are provided primarily by Plaintiff) to provide their members with these value-

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

1   added programs/services.  As such, the Association Defendants are unfairly using

2   Plaintiff's own funding to cause Sandicor to go beyond its intended purpose and to

3   produce and provide services for the sole benefit of the Association Defendants, all

4   to the detriment of Plaintiff and its members.  The Association Defendants also

5   limited Plaintiff's access to data for products Plaintiff offered, delayed contract

6   negotiations, and later offered competing products.

7           44.   In addition to the foregoing, the Association Defendants also operate

8   Sandicor to provide their respective associations with preferential treatment.  The

9   following list is not exhaustive, and is included herein simply to illustrate the

10  Association Defendants misuse of Sandicor for their benefit:

11          a.    Using Sandicor's money (read: Plaintiff's) to fund the

12                Association Defendants' activities (conferences Inman, HAR

13                MLS Connect, CMLS), meetings, dinners, etc.) while generally

14                not authorizing expenditures for Plaintiff's benefit;

15          b.    Creating committees and task forces chaired almost exclusively

16                by representatives of the Association Defendants, and failing to

17                appoint any, or only minimal, representatives from Plaintiff;

18          c.    Promoting products that compete with Plaintiff's, but not

19                promoting Plaintiff's products;

20          d.    Interfering with benefits offered by Plaintiff that may encourage

21                members to leave the Association Defendants and transfer to

22                Plaintiff (*i.e.*, contacting Point 2, engaging a prolonged

23                implementation of Buyside, and denying a feed for Just Knock);

24          e.    Requiring two "logins" for any member who transfers

25                associations, which discourages members from transferring and

26                disproportionately targets Plaintiff, as the attrition rate for the

27                Association Defendants is remarkably higher than Plaintiff's;

28                and,

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

1    f.    Refusing to respond to Plaintiff's numerous requests to cure the

2          aforementioned issues.

3    45.    Under the terms of the Shareholder Agreement, Plaintiff is without

4  recourse to prevent this mismanagement or a further waste of Sandicor's assets.

5  Despite that it holds more than two-thirds of the shares of Sandicor, it has only

6  four-elevenths of the director voting power.  Further, as alleged herein, the

7  Association Defendants have also surreptitiously restructured and misrepresented

8  costs to avoid Plaintiff's review/approval rights.  Despite this, Plaintiff is unable to

9  effect changes to the existing governance of Sandicor because the Shareholder

10  Agreement calls for at least two shareholders to pass a major resolution.

11    46.    As alleged in more detail below, the San Diego real estate market is

12  unique.  It is geographically isolated from other metropolitan areas, which provides

13  San Diego-based real estate brokers a competitive advantage over those outside the

14  area.  San Diego County is also a desirable area, and local brokers often receive a

15  substantial number of inquiries from outside of the area (*i.e.*, people from outside

16  San Diego looking at San Diego real estate).  Through the creation of Sandicor, all

17  of the MLS information for the entire county has been compiled in a database.  This

18  data (both current listing data and historical sales data) is an extremely valuable

19  asset.  Indeed, Plaintiff is informed and believes that Sandicor's MLS database

20  information is its (and Plaintiff's) most valuable asset.  Accordingly, any action that

21  may dilute the value of Sandicor's database—such as a merger or data-share

22  agreement with a non-San Diego MLS—is against not only the interests of

23  Plaintiff, but Sandicor and the Association Defendants as well.

24  **DEFENDANTS' UNAUTHORIZED EFFORTS TO MERGE SANDICOR**

25    47.    Further, while Sandicor's day-to-day operational issues are frequently

26  resolved by consensus, matters of import (*i.e.*, major corporate resolutions) are

27  resolved against Plaintiff often without any formal vote whatsoever, as required.

28  For example, the Association Defendants, in cooperation with Sandicor's CEO,

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

Ray Ewing, recently pushed through a "task force" to investigate a *merger* between Sandicor and the California Regional Multiple Listing Service ("CRMLS") at considerable expense of Sandicor. (CRMLS is a corporation that provides a partial, piecemeal state-wide MLS listing service.) As described more fully below, Plaintiff, the supermajority shareholder, alone could and did reject the merger proposal, and immediately and consistently objected to the task force's creation and related activity and expenditures that went forward without the requisite shareholder vote. Further, Plaintiff, in its capacity as a shareholder, has also repeatedly asked for certain books and records from Sandicor—as have directors appointed by Plaintiff to Sandicor's board, but to no avail.

48. In order to circumvent Plaintiff's objection to the proposed merger and merger investigation, and to avoid Plaintiff's supermajority shareholder status, Ray Ewing – in his capacity as Sandicor's CEO, and with the support of the Association Defendants – has been using his position with Sandicor to market the "benefits" of a merger, while defaming Plaintiff to its members and other third-parties, and actively encouraging Plaintiff's members to leave Plaintiff in favor of the Association Defendants.

49. This was not the first such effort by the Association Defendants and Ray Ewing. As early as 2011, Sandicor (and the Association Defendants) has explored mergers with other MLS listing services. Initially, a merger with California Real Estate Technology Services, Inc. was contemplated; fortunately, for the benefit of all involved that transaction did not materialize (in part, because of Plaintiff's opposition). When that failed, and unbeknownst to Plaintiff, the Association Defendants and Ray Ewing then turned their focus to a merger with the CRMLS.

50. Plaintiff is informed and believes that a merger would be economically irrational, and would destroy the value of Sandicor and the MLS's potential value to the associations. The merger would also dramatically impact each association's

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

1  operational revenue. Nonetheless, despite Plaintiff's repeated and express
2  opposition to any merger, the Association Defendants, through their control of
3  SANDICOR, have persisted in expending Sandicor's (Plaintiff's) funds in an effort
4  to push a potential merger, to the detriment of Plaintiff.

5      51.    Further to that end, the Association Defendants conspired to push a
6  "task force" through Sandicor's board without providing Plaintiff notice or an
7  opportunity to prevent its creation. In October 2014, the Association Defendants'
8  directors brought (and approved) a motion to create a task force. The motion was
9  inappropriately raised for the first time as a matter of "new business" without prior
10 notice to Plaintiff, but was clearly brought as part of a prior coordinated action by
11 the Association Defendants, with the intent to eliminate any opportunity by Plaintiff
12 to oppose the motion and prevent the creation of the tax force. As a result, the
13 motion passed notwithstanding that the merger and the task force were major
14 corporate resolutions that could not have been passed without Plaintiff's two-thirds
15 shareholder vote, per the Shareholder Agreement.

16     52.    Following the creation of this task force, Association Defendants and
17 Ray Ewing have continued to improperly use Sandicor's resources and goodwill to
18 promote and encourage broker-members and brokerage firms to approve a merger
19 with the CRMLS, and to also encourage Plaintiff's members to do business with
20 PSAR or NSDCAR, who support such a merger.

**V.**

**<u>DERIVATIVE ALLEGATIONS</u>**

23     53.    Plaintiff brings the Fourth and Fifth Causes of Action herein
24 derivatively in the right and for the benefit of Sandicor, to redress injuries suffered
25 and to be suffered by Sandicor as a direct result of the breaches of fiduciary duties
26 and waste of corporate assets by the Association Defendants and the directors they
27 have appointed to Sandicor's board of directors.

28 / / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

16

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

54.     Plaintiff is a shareholder of Sandicor, and has been a shareholder at all times relevant to the Association Defendants' wrongful conduct alleged herein.

55.     Plaintiff currently holds the supermajority of the shares of Sandicor, and will adequately and fairly represent the interests of Sandicor and its shareholders in enforcing and prosecuting its rights.

56.     Plaintiff has not made any demand on Sandicor's board of directors to institute this action and prosecute the derivative claims because any such demand would be futile.  As alleged herein, a majority of the members of the board of directors of Sandicor knowingly participated in, approved, benefited from, and deliberately concealed the intentional wrongdoing alleged herein, and having deliberately acted to the detriment of Sandicor, and would not have responded to the efforts to obtain relief.  Further, alleged *supra*, Sandicor's CEO, Ray Ewing, is an active participant with the Association Defendants in the complained-of conduct. Plaintiff is informed and believes that the board of directors is incapable of making an independent and disinterested decision to institute and vigorously prosecute an action against the Association Defendants.

57.     The board of directors is currently comprised of six members: Ron Brownell and Ron Romanowich were appointed from NSDCAR, holding four votes between them; Aaron Kerper and Shun Wakita were appointed from PSAR, holding three votes between them; and Saul Klein and Glen Brush were appointed from Plaintiff, holding four votes between them.  Because the Association Defendants control four of the six director positions and seven of eleven director votes, they are in a position to, and do, dominate and control the board of directors of SANDICOR.

58.     The board of directors participated in, approved, and/or permitted the wrongs alleged herein to have occurred, including, but not limited to, (*a*) exploring, approving, and creating a taskforce to investigate a merger with CRMLS; which, if the merger went through, will diminish the value of Sandicor's database; (*b*)

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

authorizing Sandicor to develop a web-portal that competes with one its

shareholders (Plaintiff) at great expense and without the necessary shareholder

approval; and (*c*) preventing Plaintiff from obtaining a data feed to use in

conjunction with its web-portal while allowing other consumer facing websites to

obtain feeds from Sandicor.

59.     Moreover, the directors appointed by the Association Defendants have

a direct and substantial financial interest in supporting the acts complained of

herein.  Because they are members of their respective shareholder associations, they

stand to benefit directly from the products and services provided by Sandicor.

More specifically, because their respective associations are incapable or unwilling

to devote resources to develop websites, or develop programs and services for its

members (unlike Plaintiff), these board members have a direct interest in having

those functions performed by Sandicor.  Given their personal financial interests in

the business of Sandicor, there is reasonable doubt that they are disinterested and

independent.  Further, the board cannot prosecute these claims without tacitly

admitting the wrongdoing of their respective associations.  As a result, any demand

upon the board of directors for Sandicor would be futile.

60.     Demand is also excused because Plaintiffs have repeatedly voiced

concerns about the acts complained of herein, but those complaints have fallen on

deaf ears.  More specifically, Plaintiff vehemently opposed the devotion of more

than $75,000 of Sandicor's funding over time to the creation, re-development and

service of a web-portal.  The board of directors ignored these concerns and pushed

the deal through.  To avoid Plaintiff's contractual right to approve or veto major

capital expenditures (such as for the creation of a web-portal), the board of directors

acted to surreptitiously mischaracterize the actual expense of the project.  Thus, not

only has the board of directors refused to consider or delay or discuss any of

Plaintiff's concerns or address the unfairness of the transactions and damages they

would cause to Sandicor, the board has also taken steps to avoid any oversight or

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

input from Plaintiff whatsoever.

61. Demand would likewise be futile because the Sandicor directors appointed by the Association Defendants have not only been complacent in acting on behalf of Sandicor, but were necessary actors in commissioning the improper conduct alleged herein.

62. On information and belief, the directors appointed by the Association Defendants are protected against liability for breaches of fiduciary duty by a liability insurance policy. Because certain provision in the insurance policy(ies) exclude coverage under particular circumstances, if those directors were to cause Sandicor to sue themselves or their shareholder associations, this may disrupt the potential for insurance protection. As such, the directors appointed by the Association Defendants are hopelessly conflicted and incapable of making any independent determination that would cause Sandicor to bring this action.

## FIRST CAUSE OF ACTION

### (Violation of the Sherman Act, 15 U.S.C. § 1)

### (Against NSDCAR, PSAR, and DOES 1 through 20)

63. Plaintiff incorporates the allegations in paragraphs 1 through 62 above as though fully set forth herein.

## I. BACKGROUND REGARDING THE CONSPIRING PARTIES

64. Plaintiff , PSAR, and NSDCAR are horizontal competitors in the market for real estate broker members in the San Diego County area. They are the only three associations in the relevant market, and they fiercely compete with one another for a nearly finite group of broker members.

65. The primary means by which Plaintiff and the Association Defendants compete is by differentiation, i.e., through the development and offering of unique products and services for their respective members. In turn, most broker members decide to join one of the associations (to the exclusion of the other associations) based on the comparative products and services available to members.

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

66.     Starting in or around 2011, merger talks began between three competing associations: NSDCAR, PSAR, and the East San Diego County Association of Realtors ("ESDCAR").  Plaintiff is informed and believes that the purpose of the proposed merger was to consolidate their resources so they could develop and offer products and services comparable to those offered by Plaintiff. The merger was approved by the members of PSAR and ESDCAR, who merged at or around that time under the name PSAR.  The merger was rejected by NSDCAR's members.  While the merger with NSDCAR did not go through at that time Association Defendants nevertheless continued their efforts to combine on an informal basis.

67.     Since that time, PSAR and NSDCAR have aligned their respective committees and committee responsibilities, and convened joint committee meetings to ensure each association was acting the same as the other and to prepare for a potential future merger.  They also started working together to offer "joint" services to their respective members in competition with Plaintiff, including joint caucus dinners financed largely by Sandicor (and thus, in part, by Plaintiff).

68.     PSAR and NSDCAR also worked to coordinate their marketing efforts and to coordinate promotions designed to harm Plaintiff.  For example, the Association Defendants regularly hold jointly marketed broker summits and symposiums. The events alternate locations between each of the two associations' epicenters, and are sometimes billed as a PSAR event or an NSDCAR event, but promotional materials often include the logos of PSAR, NSDCAR, and Sandicor. In all cases, the leaders of each association attend (as many as 25), as do members from both associations. Leaders from large and medium-sized brokerages (which are often members of all associations) also often attend.  Though the billed topics vary widely, nearly all such events include a discussion of "the other association" [Plaintiff] and its efforts to take "your [realtors'] data."  The events are designed to rally the Association Defendants' "base" and to convince brokerages, brokers, and

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

other real estate professionals in San Diego County to cancel their memberships with Plaintiff and to further influence other firm members (who are independent contractors) to drop their memberships with Plaintiff.

69.     In addition to these jointly marketed and promoted events, the Association Defendants also worked together to coordinate the offering of identical promotions, including offering transfer "credits" for any dues or fees paid to Plaintiff if the broker leaves Plaintiff and joins PSAR or NSDCAR as their primary membership.  That is, PSAR and NSDCAR jointly developed a plan designed to entice members away from Plaintiff, and presented a jointly determined set of incentives to encourage Plaintiff's members to switch associations. This is not only a direct action against each association's interest to compete for members against *all* competing associations, it is also an illegal agreement to coordinate on matters relating to the terms, promotions, and/or pricing for membership fees.

70.     Plaintiff is informed and believed that, PSAR and NSDCAR ultimately decided to abandon another attempt for a formal merger because they realized that they had greater power through the fiction of separateness.  As a result, Plaintiff is informed and believes that the Association Defendants entered into an agreement to align, but purposefully structured the deal such that they remained technically "separate" entities. This fiction of "separateness" ensured that the Association Defendants would remain in control of Sandicor's board, and as described below, would have control over the MLS data, which was an essential to all the associations' products and services.

71.     This common plan now firmly in place, PSAR and NSDCAR recently acknowledged that they have formalized a "shared services agreement," under which "access to many services, resources, and discounts offered by either Association will not be available to both PSAR and NSDCAR members irrespective of with which association they have their primary membership."  Their disclosure regarding this previously disavowed "shared services agreement"

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

1  confirmed that the newly discovered agreement was, in fact, an "expansion of a
2  relationship between the two Associations that has been in effect since 2013".

3      72.    The operation of shared service centers is an idea that has been
4  consistently rejected by the competing associations in the past because it would
5  require competing associations to share confidential membership records.
6  Confidential membership records consist largely of trade secret information that
7  legitimate competitors do not share, absent illegal coordination, because those
8  membership records could be used to recruit members by competitors.  PSAR and
9  NSDCAR now share these records—the first two Sandicor associations to do so in
10  its history—but have only been able to do so through a market allocation agreement
11  amongst themselves whereby they have agreed to *not* recruit each others' members,
12  but rather only members of Plaintiff.   In reaching this express market allocation,
13  PSAR and NSDCAR have acted against their own respective interests to fulfill their
14  joint effort as against Plaintiff.

15  **II.    SANDICOR'S GOVERNANCE FORM FACILITATED COLLUSION**

16      73.    Plaintiff and the Association Defendant collectively own and control
17  Sandicor, which was formed by the associations (and their predecessors) for the
18  sole purpose of aggregating and distributing unfiltered MLS data for the benefit of
19  all of the associations (and their members).

20      74.    Sandicor stands in a vertical relationship with Plaintiff and the
21  Association Defendants, and it controls (and provides) a critical supply (aggregated
22  MLS data) that is necessary for the associations to effectively compete.  The
23  availability of this aggregated MLS data is critical to the associations, which is why
24  they created Sandicor and entered into specific written agreements to ensure they
25  had unfettered access to that data.

26      75.    In addition to aggregating and distributing the MLS data to its
27  members, Sandicor also monetizes the MLS data feed.  Among other things, it sells
28  the MLS data feed to third parties (i.e., the Union Tribune), and also sells the MLS

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

data to syndication services, which, in turn, re-sell the same MLS data to consumer-facing websites (such as Zillow, Redfin, etc.) and other sources.  The aggregated MLS data is not private or confidential, but is actually distributed to the public regularly, through numerous different sources.

76. While Sandicor's Board of Directors hold independent fiduciary duties to Sandicor and its shareholders (including Plaintiff), the Association Defendants have been careful to nominate only those people they can direct and control. Indeed, representatives of the associations on the Sandicor board are expected to often require consultation with their respective association s before taking a position or voting at Sandicor board meetings.  Plaintiff is informed and believes that Sandicor's board members are frequently ordered to vote in a particular way, in concert with the members of the other colluding association.

77. As a result, the individual members appointed by PSAR and NSDCAR to Sandicor's board often operate at the direction of the leadership of their respective associations, and often times act against Sandicor's business and economic interests where it benefits their associations to do so (as alleged more specifically below).  This includes, among other things, using Sandicor's operational funding to create and offer products and services that PSAR and NSDCAR were otherwise unable to provide to their members.

78. In light of Sandicor's antiquated governance structure (which provided each shareholder with the same number of board members notwithstanding their comparative sizes), PSAR and NSDCAR realized that they could not merge, but actually had greater power remaining separate.  Had they merged (and had the merger passed antitrust scrutiny), they would have lost control over an essential supply that Plaintiff (and all of the other associations) needed: MLS data.

III.   DEVELOPMENT OF COMPETING WEB PORTALS

79. Historically, each of the parties has had unfettered access to the aggregated MLS data through Sandicor's portal.  While the broker members were

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

able to access and use MLS listing information (historical and current data), it was not user-friendly and did not have any additional, value-added features for its brokers or their clients. This limitation impacted the three associations equally, that is until Plaintiff disclosed its new technological innovation.

80. Based on consumer demand and input from members, Plaintiff began devoting a substantial portion of its finite resources into the development of a new, innovative platform for its members to use to review, search, and use MLS data in 2009. Called "Just Knock," Plaintiff's platform was designed to be a hyper-local community resource to assist both buyers and sellers in the home-buying process. It could be used by broker members to browse or search MLS data (both current and historical data), and it also had a public-facing portal that could be used by the broker-members' clients. None of the other local associations were providing similar services at that time (or now).

81. Just Knock's functionality depended on the integration of the aggregated MLS data feed. Because Sandicor controlled the data feed, and because PSAR and NSDCAR collectively controlled Sandicor's board of directors, Plaintiff was forced to disclose this innovation, Just Knock, to its competitors NSDCAR and PSAR in 2010, well before it was completed or ready to be rolled out for use. But for their involvement in the operation of Sandicor, PSAR and NSDCAR would not have known about Just Knock before it was rolled out, and would not have had the opportunity to collude to prevent it from launching.

82. The Associations recognized the value of this new, user-friendly portal, but lacked the resources (independently or collectively) to create their own portal to compete with Plaintiff. Instead, they (through their appointed board members at Sandicor) attempted to use Sandicor's funds to prepare a "new" web portal to compete with Just Knock. Plaintiff objected, however, because Sandicor's purpose was to aggregate and distribute the data to members, not to devote substantial resources into the development of websites that compete with Plaintiff

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

for the sole benefit of PSAR and NSDCAR. As such, Sandicor's Board agreed in 2012 to discontinue their efforts to create a competing web portal, and passed a resolution on November 21, 2012 amending the bylaws to clarify that Sandicor would not offer products and services that compete with the local associations.

## IV.    THE ANTITRUST CONSPIRACY

83.    Recognizing Just Knock as a potentially devastating competitive threat, without the resources to create their own competing product, and without Sandicor's operational funding to do the job for them, the leadership of PSAR and NSDCAR agreed to cut-off the critical data supply Plaintiff needed.

84.    In furtherance of this agreement, the Association Defendants first banded together and used their collectively control over Sandicor's Board of Directors to refuse Plaintiff's direct (and repeated) requests for the MLS data. Specifically, beginning in or around 2010, Plaintiff approached Sandicor with a request for the MLS data feed. Although that Plaintiff had the contractual right to *download* and *use* the aggregated data feed for membership consumption, the Association Defendants combined to prevent Sandicor from providing the data to Plaintiff. Despite further efforts by Plaintiff to change Sandicor's mind, including offering to pay Sandicor for the data feed, like third parties would do, Sandicor repeatedly refused Plaintiff's request.

85.    Sandicor's refusal to provide MLS data to Plaintiff was contrary to precedent, contrary to Sandicor's economic interests, and contrary to the terms of the Parties' Service Center Agreement. Indeed, Sandicor's sole purpose is to *aggregate* and *deliver* MLS data to the associations for the benefit of their members. It had never before refused to *deliver* MLS data to one of its member associations, and it was, in fact, contractually obligated to provide the aggregated data feed to the associations (including Plaintiff) for membership consumption.

86.    Sandicor also regularly distributes the same MLS data to third parties and syndication services, such that its MLS data can be accessed through a number

25

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

of different platforms (i.e., the Union Tribune, Zillow, Redfin, etc.). While Sandicor was economically incentivized to sell/distribute the same data to third parties, its board of directors nevertheless refused to provide Plaintiff with the data feed (under any terms, paid or unpaid). There was no legitimate economic or business justification for the decision by PSAR and NSDCAR's appointed directors, which served only to further the Association Defendants' conspiracy and not any legitimate interest of Sandicor. As evidenced by other concerted acts in furtherance, it is apparent that this decision was, in fact, prompted entirely by PSAR's and NSDCAR's common plan to deny Plaintiff's requests and ability to bring this competitive product to market.

87. In or around 2013, after its multiple requests to Sandicor had been summarily (and illogically) rejected, Plaintiff attempted a work-around by obtaining a syndicated data feed from a third party, Point2, who was contractually permitted to re-sell the data. PSAR and NSDCAR eventually took note, and realized that their plan would fail if Plaintiff was able to obtain access to the data from a third party. To prevent that from happening, they each took identical steps to render the syndicated data feed unusable by making it incomplete and inaccurate.

88. First, Ray Ewing (Sandicor's Chief Executive Officer and a long-time member of NSDCAR) contacted Point2 and instructed them to eliminate any data originating from NSDCAR and PSAR's brokers. He explained his view that Plaintiff was "not entitled to any data from us" because the Board of Directors had not authorized it in response to Plaintiff's repeated requests.

89. Following suit, PSAR (through Rich D'Ascoli – one of PSAR's directors for Sandicor) and NSDCAR (through Dianne McMillan – its Chief Executive Officer) immediately contacted Point2 and issued independent, but identical, instructions to Point2, demanding that they "block" any listings originating from their members from going to Plaintiff's Just Knock portal. Thus, rather than allowing their members—competing brokers—to decide whether their

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

listings should appear on Just Knock, the Association Defendants colluded to prevent those brokers from even opting in to the syndication feed.

90.     Ultimately, PSAR and NSDCAR were successful in preventing Plaintiff from obtaining the essential supply of information from every legal and/or legitimate source, rendering Plaintiff's new product effectively useless.

91.     Thus, not only did the Association Defendants combine and conspire to cause Sandicor to reject Plaintiff's request for the data feed (despite Plaintiff's contractual right to receive and use such data), but they went out of their way to prevent Plaintiff from obtaining a usable data stream through third parties—notwithstanding that the third parties had access to the full, aggregated data feed, and had the contractual right to re-sell that data feed to entities such as Plaintiff.

92.     When asked at a board meeting as to why the PSAR and NSDCAR-controlled board intervened with Plaintiff's relationship with Point2 to prevent Plaintiff from accessing the syndicated data feed (notwithstanding the fact that Sandicor had no qualms with Point2 providing the same data to third parties), Aaron Kerper of PSAR (then, the chair of Sandicor's board of directors) explained that the discrepancy was "because [the third parties] aren't competing with us."

93.     Efforts to obtain another syndication data feed were futile, because at or around the same time that the Association Defendants conspired to cut off the syndicated MLS data feed from Point2, the only other potential syndication feed source underwent an acquisition and was consolidated with Point2 such that there was only one syndication data feed available on the market (the limited data feed discussed above).

94.     These identical actions were not merely coincidental, but were carried out consciously in furtherance of the agreement and conspiracy by and between PSAR and NSDCAR to prevent Just Knock from getting off the ground. Officers of both competing associations contacted a third party the same day, issuing identical instructions, in combination with the other collusive conduct alleged herein,

demonstrates their unlawful coordination.

95.     This behavior is economically irrational, and has no legitimate business purpose other than to further the Association Defendants' anticompetitive agreement.  Both the Association Defendants and their members would profit from the inclusion of their listings in Just Knock, which would have provided exposure to potential purchasers across the county.  Instead, they each elected to forego these short-run benefits for the greater goal of eliminating competition by Plaintiff.

96.     Despite Plaintiff's investment of hundreds of thousands of dollars in development of Just Knock in anticipation of its roll-out, the Association Defendants success in cutting off the essential data supply forced Plaintiff to discontinue its plans to bring its new product to market.  Just Knock's development was halted at the "beta" stage, and the website was never rolled out or marketed to the public (or to Plaintiff's members).

97.     The Association Defendants' restraints are a *per se* violation of Section 1 of the Sherman Act because their conspiracy was designed to prevent Plaintiff from bringing new competitive tools to the marketplace, and to weaken Plaintiff as a competitor through its waste of finite competitive resources.

98.     In the alternative, the Association Defendants' conduct violates Section 1 of the Sherman Act under the rule of reason or quick-look analysis because the anticompetitive harm outweighs any procompetitive benefits.

99.     The Association Defendants' conduct further constitutes a concerted refusal to deal, through Sandicor, by limiting and/or excluding Plaintiff from access to an essential resource: the local MLS data feed.  Together, PSAR and NSDCAR, through and with Sandicor, have control over an essential supply that Plaintiff is unable to duplicate.  They have worked together to deny Plaintiff access to that supply despite it being feasible and economically incentive to provide access to it.  There is no available substitute for this data in the relevant geographic market, and it is essential to competition amongst the competing associations.

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

## A. Plus-Factor No. 1 – Sandicor, NSDCAR, and PSAR Acted Against Their Own Interests

100.   The directors of Sandicor, who were hand-picked and operated at the will of PSAR and NSDCAR, acted against Sandicor's self-interest by refusing to allow Sandicor to provide Plaintiff with an aggregated data feed.  This was contrary to Sandicor's central purpose (which was designed solely to aggregate and distribute the data to the association), contrary to the terms of the parties' Service Center Agreement, and inconsistent with its prior practices.  It was also contrary to Sandicor's economic interests, as it regularly monetized and sold the data to third parties and syndication providers, but refused to sell that same data to Plaintiff.  Further, while syndication providers are allowed to re-sell that data to other third parties for distribution, the Association Defendants took steps to interfere with Point2's ability to re-sell the data to Plaintiff.  There is no rational economic or business reason for these actions, other than to further their agreement to eliminate Plaintiff's competitive threat.

101.   PSAR and NSDCAR further acted against their own interests in entering into a market allocation agreement, as alleged above, including more specifically an agreement to refrain from recruiting each others' members.  Although it is in both of the associations' best interests to compete for *all* potential members, they are now sharing data and confidential trade secret information with one another to facilitate joint service centers pursuant to a market allocation agreement under which neither PSAR nor NSDCAR is permitted to—or will—attempt to recruit members of each others' associations.

102.   Further, PSAR and NSDCAR acted against the interests of their own members by unilaterally removing their members' listing data from the Point2 syndication feed, despite the fact that the inclusion of that information would have enabled their members' listings to be displayed and usable by people across the county.

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

103. The fact that PSAR and NSDCAR acted contrary to their respective self-interests (and against the interests of their members), and caused Sandicor to act contrary to its economic interests in breach of their fiduciary duties to Sandicor and its shareholders, is a "plus factor" that shows the above-described parallel conduct was the result of an unlawful agreement and conspiracy.

**B. Plus-Factor No. 2 – Interfirm Communications and Opportunity to Conspire.**

104. Unlike most arms-length competitors, PSAR and NSDCAR had multiple interactions on a regular basis. Among other things, they jointly operate Sandicor through hand-picked "directors," whose sole purpose is to further the interests and push the agendas of their respective associations.

105. In addition to interaction by these "directors," various members of PSAR and NSDCAR's leadership would regularly attend Sandicor meetings and functions, providing a unique opportunity for these "competitors" in the market to meet and conspire. These opportunities also existed outside of Sandicor, as they created Joint Committees and otherwise took steps to align their operations following the failed merger attempt.

106. The structure of the industry also facilitated collusion because Plaintiff was forced to disclose its development of Just Knock to its competitors well before it was ready to launch. Specifically, because PSAR and NSDCAR are represented on Sandicor's Board of Directors, and because Sandicor controls the MLS data feed Just Knock needed to function, the Association Defendants learned about Just Knock and had ample time, opportunity, and motive to conspire to prevent it from launching.

107. These regular interactions between the leadership of these two competitors lead directly to (and facilitated) PSAR and NSDCAR's identical, but illogical, actions, including causing Sandicor to refuse Plaintiff's request for the data feed and taking identical steps to render the syndicated data feed useless.

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

108.    These regular interactions between leadership of these competing organizations are "plus factors" that tend to show an antitrust conspiracy.

**C.    Plus-Factor No. 3 – Strong Motive to Enter Into Alleged Conspiracy.**

109.    As alleged above, PSAR and NSDCAR had a strong motive to conspire against Plaintiff.  Plaintiff was (and still is) the dominant player who controls more than 2/3 of the relevant market for broker-members.  At a time when they were faced with increasing attrition rates by members choosing to leave PSAR and NSDCAR and join Plaintiff, they learned that Plaintiff was developing a new, innovative platform for its members to use MLS data.  But for their positions in the operation of Sandicor, they would not have known about Just Knock nor had an opportunity to conspire to prevent it from launching.  This platform was highly sought after, and PSAR and NSDCAR recognized that it was a potentially devastating competitive threat.  They were powerless to stop Plaintiff from rolling out this product acting independently, did not have the resources to develop their own competing product, and were only able to take steps to prevent Plaintiff from rolling out Just Knock acting in concert.

110.    The presence of this strong motive to enter into the conspiracy is yet another "plus factor" that is probative of an antitrust conspiracy.

**D.    Plus-Factor No. 4 – Complex Actions That Were Not Coincidental.**

111.    As described above, PSAR and NSDCAR took nearly identical actions in short order.  After they collectively voted to reject Plaintiff's request for a data feed from Sandicor, they caused Sandicor to contact Point2 and limit and restrict the Just Knock data feed.  Almost immediately after Sandicor's agent reached out to Point2, representatives of both PSAR and NSDCAR separately contacted Point2 with identical instructions: eliminate their members' listings from the syndicated data feed that was to be provided to Plaintiff.  Further, PSAR and NSDCAR each then implemented identical rules that would prevent their own members from even having the option to opt-in to the Just Knock data feed.

31

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

112. This conduct (which, as noted above, was contrary to each of their self-interests), reveals a complicated arrangement that PSAR and NSDCAR had adopted for the purpose of frustrating and preventing Plaintiff from introducing a new competitive tool into the marketplace, and not independent, parallel conduct.

E. **Plus-Factor No. 5 – Admission Of Anticompetitive Intent for Actions.**

113. The Association Defendants do not deny that their intentions were anticompetitive. To the contrary, PSAR's own representative (who was then the chair of the board of Sandicor) explained that Sandicor had no problem giving the data to third parties (such as the Union Tribune), but would not provide the same data to Plaintiff because the rationale behind Sandicor's refusal to provide the data feed to Plaintiff, "because they [Union Tribune] aren't competing with us."

114. This admission of anticompetitive intent is a "plus factor" that eliminates any doubt that the actions could have been the result of mere conscious parallelism, and were in fact part of an unlawful conspiracy.

V. **THE CONSPIRACY INJURED PLAINTIFF AND COMPETITION**

115. The above-described conduct of NSDCAR and PSAR has caused and continues to cause harm to competition by preventing the launch of an innovative new platform that would improve quality and choice for consumers. By conspiring to prevent Just Knock from reaching the marketing, Defendants also injured Plaintiff by depriving it of the ability to effectively compete with this new product.

116. Competition was harmed because Just Knock was designed to provide consumers—here, real estate brokers and their clients—with useful tools they have never been offered and otherwise cannot obtain from other sources (certainly not from NSDCAR or PSAR). Just Knock made searching for a home an interactive experience where buyers could not only search for specific homes within the MLS listings, but also learn more about San Diego's neighborhoods, including schools, services, and events. The Association Defendants' actions prevented Just Knock from entering the market and thus deprived the market of competition in terms of

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

quality and availability.  Plaintiff suffered harm flowing directly from that anticompetitive harm: the exclusion of Just Knock prevented it from competing effectively in the market for broker members, who choose to join an association based on the benefits they can derive from that association—including Just Knock.

117.  Further, by derailing Just Knock, the Association Defendants also weakened Plaintiff as a competitive threat.  Plaintiff committed substantial, finite resources to developing Just Knock as a core benefit to market to members and prospective members—resources it could have spent competing with Defendants in other ways.  However, Just Knock was rendered worthless by Defendants conspiracy.  Plaintiff has also been placed at a competitive disadvantage, as its efforts to offer unique products and services to its members and prospective members (for whom the associations compete) has been thwarted.

118.  As a result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff has been damaged by, among other things:

    a.  Plaintiff has lost members, and lost the opportunity to gain new members, by its inability to deliver the sales portal websites despite previous marketing, and its inability to use those tools in the ongoing marketing for new members.  Plaintiff is informed and believes it has lost at least 200 new members that it would have recruited/retained but for Defendants' conduct.  As a direct and proximate result of this conduct, Plaintiff has lost tens of thousands of dollars in its loss of membership fees that would have been collected for the expected duration of membership.

    b.  Plaintiff lost thousands of dollars in subscription fees that its members would have paid for use of the Just Knock but for the Defendants' anticompetitive conduct.

    c.  Plaintiff lost hundreds of thousands of dollars in advertisement revenue that it would have received through advertisements on its

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

7633416.1

1              sales portal websites but for the Defendants' anticompetitive

2              conduct, in addition to lost advertisement placement fees.

3         d.  Plaintiff lost hundreds of thousands of dollars in development costs,

4              staffing costs, marketing costs, and equipment expenses that were

5              incurred for the creation and roll-out of Just Knock, which are not

6              recoverable because the websites have been rendered useless by

7              Defendants' conduct.

8         e.  Plaintiff was forced to incur substantial legal fees and costs for

9              legal issues caused by Plaintiff's business disruption and efforts to

10              negotiate for the release of the MLS data feed to which Plaintiff is

11              entitled, as described herein.

12      119.  Plaintiff has suffered damages, and will continue to suffer damages, as

13 a direct and proximate result of the Association Defendants' conduct as alleged

14 herein.  These injuries are the same type of injury that the antitrust laws were

15 intended to prevent.

16      120.  Plaintiff has no adequate remedy at law to prevent the Association

17 Defendants from continuing their illegal acts.

18 **SECOND CAUSE OF ACTION**

19 **(Violation of the Cartwright Act)**

20 **(Against NSDCAR, PSAR, and DOES 1 through 20)**

21      121.  Plaintiff incorporates the allegations in paragraphs 1 through 120

22 above as though fully set forth herein.

23      122.  The Association Defendants are horizontal competitors of Plaintiff.

24 Sandicor generally stands vertically to the Association Defendants and Plaintiff as a

25 cooperative that provides essential services—a consolidated multiple listing

26 service—necessary for its members to compete.

27      123.  The Association Defendants combined and conspired to restrain trade

28 in interstate commerce in violation of the Cartwright Act, by engaging in a

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

7633416.1

concerted scheme to exclude Plaintiff from the market for broker-member services by unreasonably and unjustifiably restricting and/or preventing Plaintiff's access to the MLS data feed necessary for it to effectively compete in the marketplace (and to which it is entitled).

124.   In furtherance of the conspiracy, the Association Defendants used their combined domination of the board of directors for Sandicor to restrict and/or prevent Plaintiff from accessing current and historical MLS data through Sandicor, and from a third-party syndicator of the data (Point2).  By combining forces, the Association Defendants control Sandicor and its essential MLS data and thus have market power.  They also comprise two of the three Realtor associations in San Diego County.

125.   The Association Defendants' restraints are a per se violation of the Cartwright Act because their conspiracy was designed to intervene in the marketplace, divide the marketplace and/or allocate members, and exclude their horizontal competitor, Plaintiff, from the relevant product and service markets in San Diego County.

126.   In the alternative, the Association Defendants' conduct violates the Cartwright Act under the rule of reason or quick-look analysis because the anticompetitive harm outweighs any procompetitive benefits.

127.   The Association Defendants' conduct also constitutes a concerted refusal to deal, through Sandicor, by limiting and/or excluding Plaintiff from access to an essential resource: the local MLS data feed.

128.   The Association Defendants, through their domination of Sandicor's board of directors, have market power. In the alternative, Sandicor had market power because it is a cooperative that exclusively controls access to the MLS data necessary for Plaintiff to compete in the market for member-broker services.

129.   The Association Defendants' conduct and agreements harm competition within the relevant market by excluding one of only three broker

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

1    associations from effective competition.

2         130.   The Association Defendants' conduct has no procompetitive or

3    business justification. Their conduct also lacks any scientific, health, or safety

4    justification.

5         131.   Plaintiff has no adequate remedy at law to prevent the Association

6    Defendants from continuing their illegal acts.

7                          **THIRD CAUSE OF ACTION**

8    **(Direct Claim for Breach of Fiduciary Duty By Controlling Shareholders)**

9              **(Against NSDCAR, PSAR, and DOES 1 through 20)**

10        132.   Plaintiff incorporates the allegations in paragraphs 1 through 131,

11   above, as though fully set forth herein.

12        133.   The Association Defendants are collectively controlling shareholders

13   of Sandicor.  Among other things, the Association Defendants owed Plaintiff

14   fiduciary duties of loyalty and care.

15        134.   Through their actions described above, the Association Defendants

16   breached their fiduciary duties to Plaintiff by: (*a*) causing Sandicor to expend

17   $75,000 on a web-portal for the sole benefit of the Association Defendants and over

18   the objection of Plaintiff, and without submitting the capital expenditure for

19   shareholder vote as required by the Shareholder Agreement; (*b*) causing Sandicor to

20   expend time and resources developing educational programs and services for the

21   exclusive benefit of the Association Defendants, and over Plaintiff's opposition; (*c*)

22   stifling the efforts of Plaintiff to create its own web-portal for its members by

23   refusing to provide a data feed or MLS data; (*d*) causing Sandicor to enter into a

24   data-share contract with CRMLS which threatens to destroy and devalue Sandicor's

25   most valuable asset: its MLS database; (*e*) approving the data-share agreement with

26   CRMLS despite not following proper corporate procedures and without regard to

27   its ultimate fairness to Sandicor's shareholders; and (*f*) otherwise operating

28   Sandicor for the exclusive benefit of the Defendant Associations' interests, without

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

regard to the interests of Sandicor or Plaintiff.

135. In contemplating, planning, or effecting these transactions, the Association Defendants were not acting in good faith and breached their fiduciary duties to Plaintiff.

136. As a direct and proximate result of the Association Defendants' breaches of their fiduciary duties, Plaintiff has sustained damages, and will continue to sustain damages, in an amount in excess of the jurisdictional limits of this Court subject to proof at the time of trial. When the true sum and extent of Plaintiff's damages are ascertained, Plaintiff will amend this Complaint accordingly.

137. Plaintiff is informed and believes that the Association Defendants performed the acts herein alleged with malice, fraud, and oppression, and they are therefore liable for exemplary or punitive damages.

138. Plaintiff is informed and believes that, unless immediately enjoined by order of the Court, the Association Defendants will continue to operate for the sole benefit of themselves and to the detriment of Sandicor and Plaintiff. No adequate remedy exists at law for the injuries suffered by Plaintiff, and Plaintiff will suffer great and irreparable injury if the Association Defendants' wrongful conduct is not immediately enjoined and restrained.

## **FOURTH CAUSE OF ACTION**

### **(Derivative Claim for Breach of Fiduciary Duty)**

### **(Against All Defendants)**

139. Plaintiff incorporates the allegations in paragraphs 1 through 138, above, as though fully set forth herein.

140. As alleged herein, the Association Defendants have breached their fiduciary duties as controlling shareholders and have proximately caused and will continue to cause Sandicor to suffer substantial money damages. Further, the directors appointed by the Association Defendants to Sandicor's boards—Ron Brownell (NSDCAR), Ron Romanowich (NSDCAR), Aaron Kerper (PSAR), and

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

Shun Wakita (PSAR)—similarly breached their fiduciary duties to the detriment of Sandicor and in favor of their respective associations. The conduct of the Association Defendants and their appointed directors has threatened to devalue and destroy Sandicor's most valuable asset, without consideration and on unjust terms, all to the detriment of Sandicor and its shareholders.

141. Sandicor has been injured by reason of the Association Defendants' and appointed directors' intentional breach and/or reckless disregard of their fiduciary duties owed to Sandicor and for their actions and failures to exercise their fiduciary responsibilities in good faith. Plaintiff, as a shareholder and representative of Sandicor, seeks damages and other relief for Sandicor, including legal fees and costs, and other expenditures Sandicor has incurred and will incur in connection with the conduct described above.

142. As a direct and proximate result of the conduct of the Association Defendants and their appointed directors, Sandicor has sustained damages, and will continue to sustain damages, in an amount in excess of the jurisdictional limits of this Court subject to proof at the time of trial. When the true sum and extent of Sandicor's damages are ascertained, Plaintiff reserves the right to amend this Complaint accordingly.

143. Plaintiff is informed and believes that, unless enjoined by order of the Court, the Association Defendants and appointed directors will continue to operate Sandicor to the sole benefit of themselves and to the detriment of Sandicor and its shareholders. No adequate remedy exists at law for the injuries alleged herein, and Sandicor will suffer great and irreparable injury if the Association Defendants' and their directors' wrongful conduct is not immediately enjoined and restrained.

/ / /

/ / /

/ / /

/ / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

# FIFTH CAUSE OF ACTION

## (Derivative Claim for Waste of Corporate Assets)

## (Against All Defendants)

144.   Plaintiff incorporates the allegations in paragraphs 1 through 143, above, as though fully set forth herein.

145.   By their actions alleged herein, the Association Defendants and the directors they appointed to Sandicor's board—Ron Brownell (NSDCAR), Ron Romanowich (NSDCAR), Aaron Kerper (PSAR), and Shun Wakita (PSAR)—have either directly or indirectly, and with reckless disregard, abandoned and abdicated their responsibilities and fiduciary duties to appropriately manage the business and assets of Sandicor in a manner consistent with operations of similarly privately held companies.

146.   Through the improper policies and procedures established and executed, including without limitation the decision to undertake capital expenditures without shareholder authorization and to directly compete with Plaintiff, mischaracterizing the nature of the capital expenditure to avoid oversight and approval by Plaintiff, and the decision to dilute Sandicor's valuable database via a merger with CRMLS without adequate consideration, the Association Defendants and their appointed directors have caused Sandicor to waste valuable corporate assets.  These decisions were made in the financial interests of the appointed directors and their respective associations without regard for the best interests of Sandicor and its shareholders.

147.   As a direct and proximate result of the Association Defendants' and appointed directors' gross mismanagement and breaches of fiduciary duty, including the duty of loyalty and care, as alleged herein, Sandicor has incurred, and will likely incur in the future, material financial damages in addition to damages to its reputation and goodwill, all in an amount subject to proof at the time of trial.

/ / /

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

148.   Plaintiff is informed and believes that, unless enjoined by order of the Court, the Association Defendants and the directors they appointed to Sandicor's board will continue to mismanage Sandicor and waste valuable corporate assets. No adequate remedy exists at law for the injuries alleged herein, and Sandicor will suffer great and irreparable injury if the Association Defendants' and the appointed directors' wrongful conduct is not immediately enjoined and restrained.

## SIXTH CAUSE OF ACTION

### (Direct Claim for Violation of Corporations Code section 1601)

### (Against All Defendants)

149.   Plaintiff incorporates the allegations in paragraphs 1 through 148, above, as though fully set forth herein.

150.   Plaintiff has made repeated written demands on Sandicor to make available for inspection all of the accounting books and records and minutes of proceedings to that which it is entitled to inspect as a shareholder of the company. The directors appointed by Plaintiff to Sandicor's board—Saul Klein and Glen Brush—have similarly made repeated written demands on Sandicor to inspect all books, records and documents to that which they are entitled to inspect as a director of the company.

151.   However, Sandicor (acting through the Association Defendants) have steadfastly refused to provide Plaintiff or the directors it has appointed to the company's board the documents and records to which they are entitled to inspect. The targeted documents relate to the implemented data share agreement and negotiations regarding the potential merger with CRMLS and in connection with the ongoing operation of SANDICOR, including without limitation the terms of the merger discussions and the financial data of SANDICOR.  Despite the reasonable requests for information, Defendants have refused to provide Plaintiff with the information and records that it is entitled to inspect and copy in its capacity as a shareholder and by and through the directors on Sandicor's board of directors.

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

152.   Plaintiff is informed and believes that, unless enjoined by order of the Court, the Association Defendants (acting through the board of directors for Sandicor) will continue to withhold material documents and information from Plaintiff.  No adequate remedy exists at law for the injuries alleged herein, and Plaintiff will suffer great and irreparable injury if the wrongful conduct is not immediately enjoined and restrained.

153.   Plaintiff requests an order compelling Sandicor to produce for inspection all books, records and documents authorized by California Corporations Code section 1601, and an accounting of SANDICOR.

## SEVENTH CAUSE OF ACTION

**(Violation of California Business and Professions Code section 17200, *et seq*.)**

**(Against NSDCAR, PSAR, and DOES 1 through 20)**

154.   Plaintiff incorporates the allegations in paragraphs 1 through 153, above, as though fully set forth herein.

155.   The Association Defendants' misconduct, including without limitation the violations of state and federal antitrust laws, the breaches of the fiduciary duties of loyalty and trust, among others, constituted unfair, unlawful and/or fraudulent business practices in violation of California Business and Professions Code sections 17200 *et seq*.

156.   These actions were likely to, and did, actually mislead and deceive Plaintiff, its members, and others.

157.   As a result of the Association Defendants' wrongdoings alleged herein, Plaintiff has been deprived of money and compensation in amounts to be proven at trial.  Plaintiff is entitled to disgorgement under California Business and Professions Code section 17203, restoring it the equity that the wrongful acts deprived it of, or to monetary relief or other restitutionary relief.

158.   Plaintiff is informed and believes that, unless enjoined by order of the Court, the Association Defendants will continue to undertake the unfair, unlawful

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

1   and/or fraudulent business practices herein alleged.  No adequate remedy exists at

2   law for the injuries alleged herein.

3                   **EIGHTH CAUSE OF ACTION**

4                   **(Breach of Written Contract)**

5           **(Against Sandicor and DOES 1 through 20)**

6           159.    Plaintiff incorporates the allegations in paragraphs 1 through 158,

7   above, as though fully set forth herein.

8           160.    Pursuant to the Service Center Agreement entered into by the parties

9   on or about January 15, 2004, as amended, Sandicor agreed that, in exchange for

10  monthly payments, it would provide access to its MLS data to Plaintiff to

11  "download, use and distribute … for membership consumption and statistical

12  purposes."

13          161.    Plaintiff performed all conditions, covenants, and promises required of

14  it by the Service Center Agreement, including, but not limited to, remitting monthly

15  payments to Sandicor.

16          162.    Sandicor, through its board of directors controlled by the Association

17  Defendants, materially breached, and continue to breach, the Service Center

18  Agreement by, among other things, refusing to provide Plaintiff with unrestricted

19  access to Sandicor's MLS data feed to which it is entitled.

20          163.    As a direct and proximate result of the aforementioned breach of

21  contract by Sandicor, Plaintiff has suffered damage in an amount to be shown

22  according to proof at trial.

23          164.    Plaintiff also requests an award of reasonable attorneys' fees and costs

24  incurred in the enforcement of the provisions of the Service Center Agreement.

25  / / /

26  / / /

27  / / /

28  / / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

42

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

# NINTH CAUSE OF ACTION

## (Breach of the Implied Covenant of Good Faith and Fair Dealing)

## (Against Sandicor and DOES 1 through 20)

165.   Plaintiff incorporates the allegations in paragraphs 1 through 164, above, as though fully set forth herein.

166.   Sandicor and Plaintiff entered into the Service Center Agreement on or about January 15, 2004, as amended.  The Service Center Agreement carried with it, by operation of law, the implied understanding that both parties would not do anything to unfairly interfere with the right of the other party to receive the benefits of the agreement.

167.   Plaintiff performed all conditions, covenants, and promises required of it by the Service Center Agreement, including, but not limited to, remitting monthly payments to Sandicor.

168.   All of the conditions required for Sandicor's performance had occurred or were otherwise excused.

169.   Sandicor, through its board of directors controlled by the Association Defendants, unfairly interfered with Plaintiff's right to receive the benefits of the Service Center Agreement by refusing to provide Plaintiff with unrestricted access to Sandicor's MLS database to which it is entitled.

170.   As a direct and proximate result of the aforementioned breach of contract by Sandicor, Plaintiff has suffered damage in an amount to be shown according to proof at trial.

171.   Plaintiff also requests an award of reasonable attorneys' fees and costs incurred in the enforcement of the provisions of the Service Center Agreement.

/ / /

/ / /

/ / /

/ / /

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

# TENTH CAUSE OF ACTION

## (Intentional Interference with Contractual Relations)

## (Against NSDCAR, PSAR, and DOES 1 through 20)

172.  Plaintiff incorporates the allegations in paragraphs 1 through 171, above, as though fully set forth herein.

173.  SANDICOR and Plaintiff entered into the Service Center Agreement on or about January 15, 2004.

174.  The Association Defendants, through their control of Sandicor's board of directors, knew of the Service Center Agreement.

175.  The Association Defendants, through Sandicor's board of directors, intended to disrupt the performance of the Service Center Agreement in conjunction with their ongoing efforts to operate Sandicor for their sole benefit, and to the detriment of Sandicor and its shareholders.

176.  The Association Defendants, through Sandicor's board of directors, prevented the performance of the Service Center Agreement by refusing to provide Plaintiff with unrestricted access to Sandicor's MLS database to which it is entitled.

177.  As a direct and proximate result of the aforementioned interference with contractual relations by the Association Defendants, Plaintiff has suffered damages in an amount to be shown according to proof at trial.

178.  Plaintiff is informed and believes that the Association Defendants performed the acts herein alleged with malice, fraud, and oppression, and they are therefore liable for exemplary or punitive damages.

# ELEVENTH CAUSE OF ACTION

## (Direct Claim for Declaratory Relief)

## (Against All Defendants)

179.  Plaintiff incorporates the allegations in paragraphs 1 through 178, above, as though fully set forth herein.

/ / /

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

180. An actual controversy has arisen and now exists between Plaintiff, on the one hand, and Defendants, on the other hand. Plaintiff contends that Section 4.2 of the Shareholder Agreement is unenforceable on grounds that it imposes an impermissible restriction on voting. The provision calls for at least two shareholders to approve a major corporate resolution irrespective of the actual number of shares voted in favor or, or against, a proposal. Such a requirement unlawfully facilitates and enables the minority shareholders (NSDCAR and PSAR) to mismanage Sandicor to the financial detriment of Sandicor and without regard for the interests of Plaintiff and in favor of actions to benefit their respective associations. Conversely, Defendants claim Section 4.2 is enforceable as written.

181. In addition to the dispute articulated in the preceding paragraphs, additional controversies have arisen and now exist between the parties regarding the corporate structure of Sandicor. First, Plaintiff submitted a formal proposal to Sandicor requesting certain corporate changes be made to remedy the unintended disconnect between ownership (Plaintiff) and control (Association Defendants). Those changes include: (*a*) installing new members to Sandicor's board of directors such that Plaintiff is represented by a supermajority or, alternatively, a simple majority, or (*b*) decentralizing Sandicor and vesting autonomy in the individual associations. The proposals were rejected, thus resulting in further controversy between the parties with respect to their respective rights and interests in Sandicor. Next, Plaintiff, acting as the supermajority shareholder, has also submitted a formal proposal to Sandicor recognize the prerogative of a supermajority of the shareholders with respect to large dollar value contracts and executive leadership. To date, Plaintiff's formal challenges to the related actions by Defendants have been ignored, bypassed, and their collective rights have been usurped.

182. Plaintiff requests a judicial determination of the above-referenced disputes. Such determinations are necessary and appropriate at this time so Plaintiff may ascertain its rights and duties as a shareholder of Sandicor. This situation

45

requires a final resolution and statement of affairs immediately.

183.   Plaintiff requests, in the alternative, a judicial determination that it may compel a conversion of Sandicor from a close corporation to a C corporation by an affirmative vote of two-thirds of the outstanding shares, as provided for by California Corporations Code section 158.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.     For an award of compensatory damages in three times the amount sustained by it as a result of Defendants' anticompetitive actions to be determined at trial, as provided in 15 U.S.C. § 15(a);

2.     For an award of compensatory and consequential damages on Plaintiff's state law claims in an amount subject to proof at the time of trial, but not less than $1,500,000;

3.     For an order requiring Defendants to pay restitution to Plaintiff, in an amount subject to proof at trial, to restore the wrongful gains they have accrued by their wrongful acts and conduct;

4.     For exemplary and punitive damages against each defendant in a sum sufficient to punish and make an example of said defendants;

5.     For a preliminary and permanent injunction all requiring the defendants named herein, and each of them, and their respective officers, directors, agents, attorneys, servants, and employees, and all persons acting under, in concert, with or for them from carrying on the wrongful acts complained of herein pending a trial on the merits, and thereafter;

/ / /

/ / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

46

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

1    6.    For an order compelling Sandicor to produce for inspection all books,

2 records and documents authorized by California Corporations Code section 1601,

3 and an accounting of Sandicor;

4    7.    For declaratory relief regarding the parties' rights and interests in

5 Sandicor;

6    8.    For pre-judgment interest as provided in 15 U.S.C. § 15(a) and under

7 California law;

8    9.    For Plaintiff's costs and expenses of this action, including Plaintiff's

9 reasonable attorneys' fees necessarily incurred in bringing and pressing this case, as

10 provided in 15 U.S.C. § 15(a); and,

11    10.   For such other and further relief as the Court deems just and proper.

12

DATED:  September 5, 2016          HIGGS FLETCHER & MACK LLP

13

14

                                   By:   */s/ Alexis S. Gutierrez*
15                                       ALEXIS S. GUTIERREZ, ESQ.
                                         EDWIN M. BONISKE, ESQ.
16                                       GEOFFREY M. THORNE, ESQ.
                                         Attorneys for Plaintiff
17                                       SAN DIEGO ASSOCIATION OF
                                         REALTORS®
18

19

20

21

22

23

24

25

26

27

28

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

7633416.1

THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT