UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO ASSOCIATION OF REALTORS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SANDICOR, INC., a California corporation et. al.,<br><br>Defendants. | Case No.: 3:16-cv-00096-MMA-KSC<br><br>**REPORT & RECOMMENDATION TO DENY EX PARTE MOTION TO ENFORCE SETTLEMENT**<br>**[DOC. NO. 136]** |

Currently pending before the Court is an ex parte Motion to Enforce Settlement Agreement, which was filed by defendants North San Diego County Association of Realtors ("NSDCAR") and Pacific Southwest Association of Realtors ("PSAR") (NSDCAR and PSAR are jointly referred to herein as the "Association Defendants".) [Doc. No. 136.] Plaintiff San Diego Association of Realtors ("SDAR"), opposes the Motion to Enforce and the Association Defendants have filed a Reply brief, responsive to SDAR's Opposition. [Doc. Nos. 138, 139.] The Motion to Enforce was referred by the Hon. Michael M. Anello to the undersigned for Report & Recommendation. As explained below, the Court RECOMMENDS the Association Defendants' ex parte Motion to Enforce the Settlement Agreement be DENIED.

1

## PROCEDURAL & FACTUAL BACKGROUND

This lawsuit was initiated by SDAR in January 2016 against the Association Defendants and Sandicor, Inc. [Doc. No. 1.] SDAR, NSDCAR, and PSAR are all real estate broker associations that operate in the San Diego area in direct competition with each other. [Doc. No. 52, p. 1[1].] Sandicor was created by previous iterations of these associations in order to aggregate their Multiple Listing Service ("MLS") listing databases into one centralized MLS. [*Id.*, p. 5, ¶ 16]. At the time this lawsuit was filed, and until the parties' reached their settlement, Sandicor comprised 100% of the market for consolidated MLS data for San Diego County. [*Id.*, p. 8, ¶ 27.] Through this action Plaintiff alleged the "Association Defendants [ ] acted in concert to operate Sandicor—through their control of the board of directors . . ." and to exclude plaintiff from fully accessing the MLS listings database. [*Id.*, p. 11, ¶38].

In October 2016, NSDCAR and PSAR filed an action in the San Diego Superior Court, County of San Diego captioned *North San Diego County Association of Realtors, et al. v. Sandicor, Inc., et al.*, Case No.: 37-2016-00037384-CU-MC-CTL (the "State Action"). In the State Action, NSDCAR and PSAR sought to dissolve Sandicor pursuant to California Corporations Code section 1800. [Doc. No. 136-2, *Decl. of Anthony J. Dain*, ¶4.] In response, SDAR filed a Complaint-in-Intervention in the State Action seeking a statutory buyout under California Corporations Code section 2000(a). [*Id.*]

Following years of litigation and protracted settlement discussions, the parties reached an agreement to resolve their ongoing dispute and both litigations. [*Id.*] On April 20, 2018, SDAR, Sandicor, NSDCAR, and PSAR entered into the Settlement Agreement. [Doc. No. 130-1.] Under the general terms of the Settlement Agreement, NSDCAR and PSAR agreed to cease being shareholders of Sandicor and to join the California Regional Multiple Listing Service ("CRMLS"). [Doc. No. 115, p. 3] SDAR would become the sole

---

[1] When referring to Court filings, i.e. pleadings, briefs, and supporting declarations and exhibits, the Court utilizes the numerical pagination assigned by the ECF system.

shareholder of Sandicor, which was renamed San Diego Multiple Listing Service ("SDMLS"). [*Id*.] To maintain continuity of operations, CRMLS and the parties also executed a Transition Agreement, pursuant to which the parties continued operations during the six month transition period commencing April 20, 2018, and during which a third-party (Black Knight) built an MLS platform that included all Sandicor/SDMLS listings, and all CRMLS listings. [*Id*.; Doc. No. 130-2.] Additionally, CRMLS and Sandicor executed a Datashare Agreement, which governs operations after the launch of the new platform (the "Go Live Date"). [*Id*.; Doc. No. 130-3.] The Transition Agreement and the Datashare Agreement are jointly referred to herein as the "Related Agreements." The parties also approved and consented to other transactional documents related to the Settlement Agreement. [Doc. No. 130-1, § 2.16.] The Settlement Agreement and Related Agreements were executed and became effective on April 20, 2018. [Doc. No. 136-2, *Dain Decl*. ¶¶5-8; Doc. Nos. 130-1 – 130-3.]

On September 25, 2018, the parties jointly requested the Court dismiss this action with prejudice but retain jurisdiction to enforce the Settlement Agreement. [Doc. No. 134.] Their Joint Motion was granted the same day, at which point District Judge Anello dismissed the case with prejudice and retained jurisdiction for a period of one year to enforce the Settlement Agreement, which was incorporated by reference into the Dismissal Order, along with the Related Agreements and transactional documents. [Doc. No. 135.]

## **DISCUSSION**

In their Motion to Enforce the Settlement, the Association Defendants contend SDAR has breached numerous material terms of the parties' Settlement Agreement and the related agreements. The alleged breaches are:

1) SDAR's use of a telephone number previously used as Sandicor's general business number as a telephone number for SDMLS. The Association Defendants contend the use of this number is in breach of Section 4.4 of the Settlement Agreement, which prohibits SDMLS, CRMLS and the parties from using "any identifying features" of Sandicor after the Go Live Date, unless CRMLS and the parties' consent to such use in writing, which has not occurred [Doc. No. 136-1, pp. 11 & 17-19];

*2)* During a Broker Roundtable Discussion hosted by SDAR, SDAR employees presented slides and made comments about NSDCAR and PSAR pertaining to the litigation that were disparaging to the business reputations, such as "SDAR wanted to fix Sandicor" while "NSDCAR and PSAR wanted to dissolve Sandicor" and "join CRMLS, an MLS in L.A." [Doc. No. 136-1, pp. 11-12; Doc. No. 136-2, *Dain Decl.*, ¶11, Ex. 4.] The Association Defendants contend SDAR's slides and comments are in breach of Sections 4.1 and 10.5 of the Settlement Agreement. [Doc. No. 136-1, pp. 11-12 & 19];

3) SDAR hired Daina Moore, a former Sandicor employee, prior to the "Go Live Date," which the Association Defendants claim is a breach of Section 5.4.4 of the Transition Agreement, which prohibits SDMLS, CRMLS, and the parties from soliciting or encouraging Sandicor employees to leave their employ or from hiring Sandicor employees before the Go Live Date. [*Id.*, pp. 12 & 20-21];

4) SDAR has engaged in marketing communications that violate Sections 4.1 and 10.5 of the Settlement Agreement [*Id.*, pp. 12-13, & 21-22];

5) SDAR staff member Mark Cowan is alleged to have made disparaging comments, in breach of Section 10.5 of the Settlement Agreement and Section 8.7 of the Transition Agreement. [*Id.*, pp. 13 & 22-23.] The Association Defendants further contend that after this litigation was dismissed, SDAR continued to falsely warn that members would lose access to features of their MLS because Sandicor was dissolved [*Id.*, pp. 14 & 23]; and

6) Roland Arevalo, the MLS & Member Care Coordinator for SDAR, contacted Black Knight and attempted to gain access to subscriber roster information data that SDAR was not entitled to. The Association Defendants contend this this data is confidential information pursuant to Section 2.8 of the Transition Agreement and SDAR's attempt to access it was an attempt to work around Sections 3.1 and 3.4 of the Transition Agreement, and also is in breach of Section 8.9 of the Transition Agreement. [*Id.*, pp. 14 & 23-24];

The Association Defendants request the Court enjoin the SDAR from breaching the terms of the Settlement Agreement and Related Agreements and grant them attorney's fees and costs incurred in connection with filing the ex parte Motion to Enforce. [*Id.*, pp. 25-27.]

### A. The Scope of the Court's Jurisdiction to Enforce the Settlement Agreement

As a threshold issue, the Court must address the scope of its jurisdiction to enforce the parties' settlement. *Venable v. Louisiana Workers Comp. Corp.*, 740 F.3d 937, 941 (5th Cir. 2013) ("'As a court of limited jurisdiction, a federal court must affirmatively ascertain subject-matter jurisdiction before adjudicating a suit.'") (citation omitted). A post judgment claim which seeks "enforcement of a settlement agreement 'is more than just a continuation or renewal of the dismissed suit, and thus requires its own basis for jurisdiction.'" *Ortolf v. Silver Bar Mines, Inc*., 111 F.3d 85, 87 (9th Cir.1997) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994)). The Court must analyze its own post-judgment jurisdiction to enforce the settlement agreement sua sponte even if neither party claims jurisdiction is absent. *See U.S. v. Millenium Pharms., Inc.*, 09CV03010-MCE-EFB, 2014 WL 1270581, *3 (E.D. Cal. Mar. 26, 2014) (" '[C]ourts have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party.'") (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)); *White v. Deloitte & Touche*, No. 13–55549, 553 F. App'x 754, 2014 WL 279501, *1 (9th Cir. Jan. 27, 2014) (noting the "court's obligation to determine sua sponte whether it has subject matter jurisdiction") (citing *Moore v. Maricopa Cty. Sheriff's Office*, 657 F.3d 890, 894 (9th Cir. 2011)); *see also* Fed. R. Civ. P. 12(h)(3) ("If the Court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

A District Court's jurisdiction to enforce settlements is limited. Generally, "enforcement of [a] settlement agreement is for state courts, unless there is some independent basis for jurisdiction." *Kokkonen,* 511 U.S. at 382. That basis exists when, upon dismissal of an action, the District Court includes a separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or incorporates the terms of the settlement agreement in the dismissal order. *Id*. at 381; *see also Buckhannon Bd. and Care Home, Inc. v. West Va. Dept. of Health and Human Res.'s*, 532 U.S. 598, 605 at n.7 (2001) ("[F]ederal jurisdiction to enforce a private contractual settlement will often be

lacking unless the terms of the agreement are incorporated into the order of dismissal.") A district court must explicitly incorporate the terms of the settlement agreement and the parties' obligation to abide by it into the order of dismissal. *See Ortolf*, 111 F.3d at 88.

SDAR argues the Motion to Enforce must be denied because the Court lacks jurisdiction to grant the injunctive relieve the Association Defendants seek because their claims of alleged breaches are all subject to the ADR provisions of the Transition and Datashare Agreements, which were "carved out" of the scope of the Court's retention of jurisdiction in the Dismissal Order. [Doc. No. 138, pp. 6-13.] The Association Defendants refute that argument, claiming that because the Settlement Agreement, which does not contain an ADR requirement, is the primary document, and because the Court retained jurisdiction to enforce the Settlement Agreement, they may seek judicial intervention without first submitting their dispute to arbitration. [Doc. No. 139, pp. 5-8.]

Pursuant to *Kokkonen* and its progeny, any discussion regarding the scope of the Court's jurisdiction over the parties' current dispute must begin with an examination of the language of the Dismissal Order which, in pertinent part, the states:

> The parties stipulate that the action be dismissed with prejudice, that each party bear its own costs and attorneys' fees, and that ***this Court "shall have jurisdiction to enforce the Settlement Agreement*** pursuant to California Code of Civil Procedure section 664.6, and no Party shall deny the same or claim a lack of such jurisdiction. ***To this end, the Parties have lodged the Settlement Agreement and other related agreements and documents with the Court, the terms and conditions of which, are fully incorporated into this Stipulation and the Court's order of dismissal.*** Nothing in this Stipulation shall alter or operate to waive any mediation or arbitration rights contained in any of the related documents to the Settlement Agreement.

[Doc. No. 135, p. 2 (emphasis added), citing to Doc. No. 134, p. 2.] This language mirrors that of the parties' Joint Motion to Dismiss, which defines Settlement Agreement as referring to the Confidential Settlement Agreement and Mutual General Release. [Doc. No. 134, p. 2.] Clearly, the language "this Court 'shall have jurisdiction to enforce the Settlement Agreement'" in combination with the Court's incorporation by reference of the

Settlement Agreement, confers on the Court jurisdiction to enforce a breach of this agreement. As previously mentioned, the Settlement Agreement does not contain an ADR provision so redress for any alleged breach(es) falls squarely within the jurisdiction of the Court, pursuant to the parties' Joint Motion to Dismiss and Dismissal Order.

The Association Defendants' arguments, however, assume jurisdiction was also retained to enforce the Related Agreements, neither of which are specifically identified in either the Dismissal Order or the parties' Joint Motion to Dismiss. This assumption presumably is derived from the Dismissal Order's incorporation by reference of "other related agreements and documents." The Dismissal Order does not elaborate as to what agreements are encompassed by this language but there does not appear to be any dispute that it refers to the Transition Agreement and Datashare Agreement, both of which were previously filed with the Court.

As previously discussed, pursuant to *Kokkonen*, a settlement contract's incorporation by reference in a Dismissal Order can serve as the basis for a court's continued jurisdiction to enforce the parties' agreement. Here, however, the Dismissal Order expressly states the Related Agreements were incorporated *only* for the specific purpose (i.e. "[t]o this end") of the Court retaining jurisdiction to enforce the Settlement Agreement, which the parties defined as only referring to the Confidential Settlement Agreement and Mutual General Release. [*Id*.] The parties did not request the Court retain jurisdiction to enforce the Related Agreements. [*Id*.] Thus, while the Dismissal Order expressly retains jurisdiction to enforce the Settlement Agreement, it does not contain a similar provision with respect to either the Transition Agreement or the Datashare Agreement. [Doc. No. 135.]

The Court further notes that both of the Related Agreements contain ADR provisions which the Dismissal Order expressly addresses and states that it "shall [not] alter or operate to waive any mediation or arbitration rights contained in any of the related documents to the Settlement Agreement." [Doc. No. 135.] Clearly, if the parties intended for this Court to retain jurisdiction over disputes stemming from the Related Agreements, there would

7

have been no reason for the parties to include ADR provisions therein, or for the Dismissal Order to state these ADR provisions are not altered by the Court's retention of jurisdiction to enforce the Settlement Agreement.

Lastly, not all the signatory parties to the Related Agreements consented to the Court's jurisdiction. For example, CRMLS entered into both of the Related Agreements, but is not a party to this case and did not consent to the Court's jurisdiction. Thus, the mechanism for any party to the Transition Agreement or Datashare Agreement to seek redress for alleged breaches of these agreements, lies within the ADR provisions included therein.

Because the parties did not specifically request the Court to retain jurisdiction to enforce the terms of the Transition Agreement or the Datashare Agreement, the Court will not address any arguments made by the Association Defendants pertaining to alleged breaches thereof, nor will the Court address plaintiff's argument that the arbitration provisions contained in these agreements should be enforced, as these issues are beyond the purview of the Court's jurisdiction.

**B. The Alleged Breaches of the Settlement Agreement**

For the purpose of interpretation, settlement agreements are treated like contracts. *Adams v. Johns-Manville Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). Local law applies to a determination regarding the scope of the settlement even when the underlying cause of action is federal. *United Commercial Ins. v. Paymaster Corp.*, 962 F.2d 853, 857 (9th Cir. 1992). In California, contract interpretation consists of ascertaining the meaning to be given to the expression of the parties. *See* Cal. Civ. Code § 1635 et seq. The parties' intent determines the meaning of the contract—this inquiry is objective and "manifested in the agreement and by surrounding conduct" instead of the parties' subjective beliefs. *Adaptix, Inc. v. ASUSTek Computer Inc.*, 5:14CV03112-PSG, 2015 WL 12839165, at *1 (N.D. Cal. Apr. 24, 2015); *Ebates Performance Mktg. Inc. v. Integral Techs. Inc.*, 12CV06488-JST, 2013 WL 4427115, at *2 (N.D. Cal. Aug. 13, 2013). In other words, "unexpressed intent is irrelevant to the [c]ourt's task in interpreting the contract." *Id*. Although "[w]here

material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing," *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987), no hearing is necessary here because there is no dispute regarding the existence or terms of the parties' agreement, only as to the interpretation and application of those terms.

Where the language of a contract is clear and not absurd, it will be followed. (Cal. Civ. Code §1638; *see also Pierce v. Merrill,* 128 Cal. 464, 472 (1900) ("Where the terms are plain and certain… the court will be guided by the language used and construe the intention of the parties to have been in accordance with their agreement."). "It is a general rule governing the construction of contracts that unless a contract is ambiguous, its meaning must be determined from the words used; and courts will not, because a more equitable result might be reached thereby, construe into the contract provisions that are not therein." *Apra v. Aureguy*, 55 Cal.2d 827, 830 (1961). When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone. Cal. Civ. Code 1639. But if the meaning is uncertain, the general rules of interpretation are to be applied. Cal. Civ. Code §1637; *see also Burns v. Peters*, 5 Cal.2d 619, 623 (1936); infra, §767 et seq.; *Wachs v. Wachs,* 11 Cal.2d 322, 326 (1938); *Pacific Indem. Co. v. California Elec. Works, Ltd*., 29 Cal.App.2d 260, 272 (1938); *Norton v. Farmers Auto. Inter-Ins. Exchange*, 40 Cal.App.2d 556, 560 (1940).

### *1. Telephone Number*

The Association Defendants argue SDAR's use of telephone numbers previously used by Sandicor, specifically (858)622-6200, which Sandicor used as its general business number, after the Go Live Date, is contrary to Section 4.4 of the Settlement Agreement, which admonishes against use of "any identifying features" of Sandicor. [Doc. No. 136-1, pp. 17-19 & 29-30.] Section 4.4 states:

> Neither SDMLS or CRMLS nor any Party, or any subsidiary, affiliate, employee, Member, subscriber, or any entity that is owned in any part by SDMLS, CRMLS or any Party, may use the name, URL, trademarks, trade

> dress or any identifying features of "Sandicor" after the Go Live Date, unless approved in writing by all other Parties and CRMLS.

[Doc. No. 131-1, p. 11 of 22.] The Association Defendants also contend SDAR's use of the phone number violates Sections 3.9 and 4.1 of the Settlement Agreement. [Doc. No. 136-1, p. 13.] Section 3.9 requires Sandicor to abandon all use of the Sandicor name after the Go Live Date. [Doc. No. 130-1.] Section 4.1 prohibits SDAR and SDMLS from advertising, marketing, or communicating that SDMLS is either a continuation of, formally known as, or operated as "Sandicor." *Id.*

The principle of *ejusdem generis* is instructive in interpreting the parties' intent with respect to Section 4.4. *Ejusdem generis* provides that in interpreting a contract in which general descriptive words are clarified by more specific words, the general words are construed so as to embrace only things similar in nature to those enumerated by the specific words. *See Nygård, Inc. v. Uusi-Kerttula*, 159 Cal.App.4th 1027, 1046 (2008) (phrase "any information, knowledge or data of the Company" was construed in consideration of the types of protected information enumerated in following sentence.) The rule contemplates that, if contracting parties intended a general word to be used in its unrestricted sense, they would not also offer as examples particular things or classes of things, "since those descriptions would then be surplusage." *Kraus v. Trinity Management Services, Inc.*, 23 Cal.4th 116, 141 (2000).

Here, Section 4.4 specifically precludes the continued use of the "name, URL, trademarks, [and] trade dress" of Sandicor, and generally precludes continued use of "any [other] identifying features." In this situation the doctrine of *ejusdem generis* requires the more general description "any [other] identifying features" be interpreted consistent with the more the specific prohibitions enumerated in the Settlement Agreement. The specific descriptors (name, URL, trademark, and trade dress) are all means by which Sandicor held itself out to its clients and the public. In contrast, the telephone number at issue [(858)622-6200] is generic, non-descriptive and contains no distinguishing characters that tie it to Sandicor, other than it was once used by Sandicor, much as SDAR's physical address was

once used by Sandicor.[2] [Doc. No. 138, p. 15; Doc. No. 136-1, pp. 29-30.] A non-descript telephone number is not a means by a business identifies and promotes itself, unlike a business name, URL, trademark, or trade dress. Thus, the telephone number at issue is not an "identifying feature," pursuant to Section 4.4.

SDAR's use of the telephone number does not violates Section 3.9, because that provision requires Sandicor to abandon all use of the Sandicor name after the Go Live Date, and makes no mention of the use of telephone numbers. [Doc. No. 130-1.] Section 4.1 prohibits SDAR and SDMLS from advertising, marketing, or communicating that SDMLS is either a continuation of, formally known as, or operated as "Sandicor." As explained, *supra*, the use of a generic telephone number is not equivocal to an advertising or marketing communication that states or implies SDAR is a continuation of Sandicor.

### 2. *The PowerPoint Presentation*

The Association Defendants next argue that SDAR breached the Settlement Agreement during a PowerPoint presentation made during an event SDAR hosted on July 13, 2018, called a "Broker Roundtable Discussion." Two of the slides that were displayed contained text that stated: (1) "SDAR wanted to fix Sandicor," and (2) "NSDCAR and PSAR wanted to dissolve Sandicor" and "join CRMLS, an MLS in L.A." [Doc. No. 136-1, p. 19; Doc. No. 136-2, *Dain Decl.*, Ex. 4.] The Association Defendants contend these statements constitute a default of Sections 4.1 and 10.5 of the Settlement Agreement. [Doc. No. 136-1, p. 19.]

Section 4.1 of the Settlement Agreement covers a broad range of subjects. As relevant here, it provides:

> No party may communicate a claim of victory or winning of the Federal or State Litigation, or any disputes related to the Federal or State Litigation, including a portrayal that the party received or obtained what that party had sought in the lawsuits.

---

[2] In comparison, Sandicor also utilized a toll-free number that specifically identified Sandicor. [Doc. No. 138, p. 17.] That number has been abandoned by SDAR. [*Id.*]

11

[Doc. No. 130-1, p. 10.] Section 10.5 is a typical non-disparagement provision that provides, in relevant part:

> In no event shall any Party make or cause or encourage others to make any false or disparaging comments about any other Party or in any way criticize the personal and/or business reputations, products, services, practices or conduct of the other . . . including, but not limited to, the alleged Claims resolved by this Agreement....

[*Id*., p. 16.]

The Association Defendants do not specify how SDAR's statements violate Section 4.1, nor is it at all apparent to the Court how the statements could be construed as a claim that SDAR was victorious in either this or the state-court venued litigation, as prohibited under Section 4.1. The gravamen of this case was SDAR's assertion that the Association Defendants mismanaged Sandicor. [Doc. No. 52.] The statement "SDAR wanted to fix Sandicor" is consistent with the allegations made in this lawsuit, which are public record, and does not imply the outcome of the litigation was in SDAR's favor. Similarly, the statement that "NSDCAR and PSAR wanted to dissolve Sandicor" and "join CRMLS" describe the allegations made in the state-court venued dissolution action. It also does not represent, impliedly or overtly, that SDAR won that lawsuit or obtained a favorable outcome in that case.

With respect to the non-disparagement provision in Section 10.5, again the Association Defendants do not explain how these statements violate the terms of the parties' Settlement Agreement. As explained, these statements are accurate descriptions of the allegations made in public filings by the parties. The Association Defendants have not offered any evidence or argument to show that either statement is a "false or disparaging comment," or that they "criticize" the practices of the Association Defendants.

Even if the aforementioned statements were found to be a breach of the Settlement Agreement, the Association Defendants have not shown they merit injunctive relief. A party seeking an injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate

for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Actual evidence of harm or injury is required, not mere speculation or inference. *Id.*

Similarly, under contract law specific performance is an extraordinary remedy for a claimed breach of contract, which necessarily requires a showing that the contract has been breached. *See Porporato v. Devincenzi*, 261 Cal.App.2d 670, 674 (1968). Once the breach is established, in order to obtain specific performance of a contract, the aggrieved party must generally show: "(1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract." *Real Estate Analytics, LLC v. Vallas*, 160 Cal.App.4th 463, 472 (2008) (citations omitted). As a remedy in equity, it has long been recognized that "specific performance will be granted only where the legal remedy is inadequate." *Eagle Rock Entertainment, Inc. v. Coming Home Prods, Inc.*, CV03-571 FMC(AJWx). 2004 WL 5642002, at *17 (C.D. Cal. Sept. 1, 2004), citing *Morrison v. Land*, 169 Cal. 580 (1915). As the California Supreme Court explained, "the exclusive jurisdiction of equity to grant relief by way of specific performance of a contract will be exercised only in those cases where the legal remedy of compensatory damages is insufficient under the circumstances of the case . . . to do complete justice between the parties." *Morrison*, 169 Cal. at 586.

The Association Defendants have not shown they suffered any harm or injury, not to mention an irreparable injury, by SDAR's PowerPoint presentation. Nor have they shown any such injury could not be remedied by monetary damages or that an equitable remedy is warranted. There is no dispute that upon the Association Defendants' request SDAR immediately removed the slides containing the aforementioned statements from the

PowerPoint. [Doc. No. 123-1, *Decl. of Michael Mercurio*, ¶ 14.] Since that time, these slides have not been used or displayed, and SDAR has agreed that it will not use that language in any future presentations. [*Id.*] Therefore, there is minimal, if any, risk these statements will be repeated in the future irrespective of whether the Association Defendants were granted the injunctive relief they seek.

### *3. SDAR's Employment of a Former Sandicor Employee.*

The Association Defendants next contend SDAR breached Section 5.4.4 of the Transition Agreement when it hired Daina Moore, a former Sandicor employee, prior to the "Go Live Date." [Doc. No. 136-1, pp. 20-21.] As discussed in Section A, *supra*, the Court does not have jurisdiction to enforce the Transition Agreement.

### *4. Mass Communications*

The Association Defendants allege SDAR made two mass communications that violate Section 4.1's 's prohibition on SDAR and SDMLS from advertising, marketing or communicating that SDMLS was a continuation of, or formerly known as, or operating as Sandicor. [*Id.*, pp. 21-22.] The first communication is alleged to have been made on August 1, 2018, and is captioned "SDAR to Rebrand Sandicor as San Diego MLS in September." [Doc. No. 136-2, *Dain Decl.*, ¶ 13, Ex. 5.] Then, on August 7, 2018, SDAR is alleged to have dispatched another communication entitled "Your Preferred MLS is Getting Better this Fall." [*Id.* ¶ 14, Ex. 6.] This communication states "[SDAR] is pleased to announce it will wholly own your MLS which will then be rebranded [SDMLS]." [*Id.*]

SDAR explains these communications, which were made on its Facebook page, were used to educate its members that SDMLS would be "replacing" Sandicor.[3] The word

---

[3] SDAR also argues that NSDCAR has made similar communications, relaying that is now associated with CRMLS. Such conduct, however, is not a violation of the terms of the Settlement Agreement. While the Settlement Agreement prohibits SDAR from associating itself with Sandicor, that provision is one-way, meaning there is not a similar restriction with respect to the Association Defendants associating themselves with CRMLS.

14

"rebranding," however, has other implications. The use of the word "rebranding" to describe SDMLS's relationship to Sandicor, connotes that SDAR is a continuation of Sandicor. As such, this is a breach of the Section 4.1 of the Settlement Agreement.

The Association Defendants have not, however, established this breach warrants injunctive relief or an order of specific performance. As discussed in Section B.2., *supra*, the Association Defendants have not shown they suffered any harm or injury, not to mention an irreparable injury, by SDAR's Facebook posts. Nor have they shown any such injury could not be remedied by monetary damages or that an equitable remedy is warranted.

Additionally, SDAR is not likely to hold itself out as a "rebranded" Sandicor in the future. SDAR explains the offending Facebook posts were made by an employee who was not aware of the terms of the parties' settlement, and the posts were permanently removed as soon as SDAR learned of the Association Defendant's objection to them. [Doc. No. 138, pp. 18-19, fn. 2; Doc. No. 123-1, *Mercurio Decl*. ¶ 17.] They have not been re-posted or otherwise disseminated since and SDAR has implemented a new procedure to ensure all future posts are reviewed for compliance with the Settlement Agreement. [*Id*.]

### 5. *Alleged Disparaging Comments*

The next claimed breach is based statements alleged to have been made by SDAR employees. Mark Cowan is alleged to have told an unidentified member of SDAR that she would "lose all her history, contacts, and saved searches" if she changed brokers. [Doc. No. 136-2, *Dain Decl*. ¶ 15.] The other statement is alleged to have been made by an individual named Eddie, who purportedly told a member of NSDCAR that "he would lose access to Paragon, zip forms, and his key card, and that he would not have access to San Diego County MLS listings since NSDCAR was no longer part of Sandicor and was now part of CRMLS." [Doc. No. 136-5, *Decl. of Martha Peralta*, ¶ 4.] The Association Defendants claim these statements violated the Settlement Agreement's non-disparagement provision (Section 10.5) and also Section 8.7 of the Transition Agreement. [Doc. No. 136-1, pp. 22-23.] As previously discussed, the only claim over which the Court

15

3:16-cv-00096-MMA-KSC

has jurisdiction is the alleged breach of the Settlement Agreement's non-disparagement provision.

The only evidence of these alleged statements, which SDAR denies were made, are the declarations of counsel and Ms. Peralta. [*cf.* Doc. No. 136-2, *Dain Decl*. ¶15, Ex. 9; Doc. No. 136-5, *Peralta Decl*. ¶4; Doc. No. 123-5, *Decl. of Mark Cowan,* ¶ 3.] Mr. Dain, who represents the Association Defendants in this case, states:

> [I]t was brought to my attention that on August 8, 2018, a member of SDAR who was changing brokers and would be working with a PSAR member was told by a SDAR staff member named Mark that she would lose all of her history, contacts and saved searches if she changed memberships and MLS. After this sixth incident, I contacted SDAR and brought to its attention the fourth and fifth violations about the mass communications by SDAR, and the sixth violation by SDAR's member Mark Cowan.

[Doc. No. 136-2, *Dain Decl*. ¶15.] Attached to Mr. Dain's declaration is a copy of correspondence he sent to SDAR's counsel on August 14, 2018, in which he reports a number of alleged breaches of the Settlement and related Agreements, including this one. [*Id.*, Ex. 9.]

Ms. Peralta is the Membership Director at NSDCAR. [Doc. No. 136-5, *Peralta Decl*. ¶1.] Her declaration states in relevant part:

> 3. As part of duties as Membership Director, I receive communications from prospective and existing members on a regular basis and document such communications in order to provide better services to such members of NSDCAR.
>
> 4. On October 1, 2018, I received a communication from a member of NSDCAR Robert Snow who informed me of a communication on that same day from an individual identified as Eddie who was using the telephone number 858-715-8040. In that communication, Mr. Snow was informed that he would lose access to Paragon, zip forms, and his key card, and that he would not have access to San Diego County listings since NSDCAR was no longer part Sandicor and was now part of CRMLS. ln response to Mr. Snow's inquiry, I reassured him that these communications he had received were inaccurate.

> 5. In response to this communication, I passed along this information to NSDCAR's management to relay to counsel for NSDCAR.

[*Id.*, ¶¶ 3-5.]

Both statements are clearly hearsay and Ms. Peralta's statement that she received a communication from Mr. Snow about a communication he had with someone named Eddie is double hearsay. Fed. R. Evid. 801 (defining hearsay as an out-of-court statement offered for the truth of the matter asserted.) As such, Mr. Dain and Ms. Peralta's statements are inadmissible unless they meet an exception to the hearsay rule. Fed. R. Evid. 802.

The Association Defendants apparently concede Mr. Dain's statement is inadmissible hearsay, as they offer no argument to the contrary. With respect to Ms. Peralta's statement, they indirectly invoke what is often referred to as the business records exception, arguing Ms. Peralta's observations were "contemporaneous records of activity" made within the scope of her employment. [Doc. No. 139, p. 13.]

Fed. R. Evid. 803(6) provides that a record of an act, event, condition, opinion or diagnosis is not inadmissible under the hearsay rules if:

(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

The Association Defendants make no showing Ms. Peralta's statement satisfies this exception to the hearsay rule, and it clearly does not. First, although Ms. Peralta's job duties

regularly include receiving communications and documenting communications from prospective and existing members, no evidence is presented to show the specific statement at issue was documented as part of Ms. Peralta's regular practice. In fact, to the contrary, the manner in which this statement is offered into evidence (in the body of Ms. Peralta's declaration, made under penalty of perjury) suggests her communication with Mr. Snow was documented for the purpose of supporting the Association Defendants' Motion, as opposed to having done it in the regular course of her employment with NSDCAR. Moreover, her statement was not made contemporaneously, or near contemporaneously, with her communication with Mr. Snow, as required by Fed. R. Evid. 803(6)(A). Ms. Peralta's conversation with Mr. Snow took place on October 1, 2018, whereas her Declaration was not made until nearly two and a half weeks later, on October 18, 2018. [Doc. No. 136-5, *Peralta Decl.*, ¶ 1.] Lastly, even if Mr. Peralta's statement did satisfy Rule 803(6) or another exception to the hearsay rule, the Association Defendants offer no argument as to why the underlying the hearsay communication (between Mr. Snow and an individual identified as Eddie), upon which Ms. Peralta's statement is predicated, should be admissible.

On the other hand, SDAR offers the Declaration of Mr. Cowan, which is based on his first-hand knowledge. Mr. Cowan denies ever telling anyone that they would lose all their history, contacts, and saved searches by changing brokers. [Doc. 123-5, *Cowan Decl.*, ¶ 3.] Mr. Cowan also acknowledges he does not believe that statement to be true. [*Id.*] In response, the Association Defendants make the confusing argument "SDAR essentially concedes that Mr. Cowan's statements would be a default *if they were made…*" [Doc. No. 139, p. 13 (emphasis added).] The operative word in their argument is "if," as there is no competent evidence to show the alleged statements actually were made.

**5. Mr. Arevalo's Alleged Inquiry to Black Knight**

The sixth breach the Association Defendants allege stems from a communication between SDAR's MLS & Member Care Coordinator, Ronaldo Arevalo, and Black Knight. The Association Defendants contend Mr. Arevalo contacted Black Knight and attempted

18

to gain access to subscriber roster information to which SDAR is not entitled. The Association Defendants contend this data is confidential information pursuant to Section 2.8 of the Transition Agreement and SDAR's attempt to access it was an attempt to work around Sections 3.1 and 3.4 of the Transition Agreement, and also is in breach of Section 8.9 of the Transition Agreement. As discussed in Section A, *supra*, the Court does not have jurisdiction to enforce the Transition Agreement.

### 6. Fees & Costs

The Association Defendants report they have incurred at least $35,000 in expenses, attorneys' fees and costs since becoming aware of the first known incident of default, which they seek to recoup from SDAR, pursuant to the Settlement Agreement's Attorneys' Fees provision. [Doc. No. 136-1, pp. 27-28.] Section 14.15 provides "in the event of any controversy, claim, or dispute between the Parties hereto, arising out of or relating to this Agreement, or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys' fees and costs, and overhead incurred and billed by counsel for the prevailing party, and expert witness fees, if any." [Doc. No. 130-4, § 14.15.] SDAR opposes the request, and asks for expenses, attorneys' fees and costs be awarded in its favor.

Here, neither side can fairly be called a prevailing party with respect to this dispute. On the one hand, as discussed in Section B.4., *supra*, SDAR clearly breached the Settlement Agreement on two occasions when it marketed itself on Facebook as a rebranded version of Sandicor. Thus, SDAR cannot be considered to be the prevailing party with respect to this ex parte Motion because it is culpable for two separate breaches of Section 4.1 of the Settlement Agreement.

On the other hand, although the Association Defendants established these breaches occurred, they have not shown they suffered any harm or injury or established they are entitled to the equitable relief they seek, and the Court has recommended their ex parte Motion be denied with respect to this issue. Moreover, the evidence suggests this matter was basically resolved through meet and confer efforts, essentially obviating the need for

the Association Defendants' ex parte Motion. The Facebook posts, which were made in August 2018, were made by an employee who was unfamiliar with the terms of the parties' settlement and were immediately and permanently removed when brought to SDAR's attention. [Doc. No. 138, pp. 18-19, fn. 2; Doc. No. 123-1, *Mercurio Decl*. ¶ 17.] SDAR subsequently took remedial measures to ensure all future posts comply with the terms of the parties' Settlement Agreement and SDAR has not made any marketing communications since that are alleged to violate the terms of parties' Settlement Agreement. [*Id*.] The Association Defendants failed to prove any other alleged breach of the Settlement Agreement. The Court recommends, therefore, that expenses, attorneys' fees or costs not be awarded to either side.

## CONCLUSION

Based on the foregoing, the Court RECOMMENDS the Association Defendants' ex parte Motion to Enforce be DENIED.

This Report and Recommendation is submitted to Hon. Michael M. Anello, pursuant to Title 28, United States Code, Section 636(b).

IT IS HEREBY ORDERED that ***no later than June 17, 2019*** any party to this action may file and serve written objections to this Report and Recommendation. The document should be captioned "Objection to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to objections shall be filed and served ***no later than June 24, 2019***. The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appear of this Court order. *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: May 31, 2019

Hon. Karen S. Crawford
United States Magistrate Judge